**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 23, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

GREYSTONE CONSTRUCTION,
INC., PETER J. HAMILTON, THE
BRANAN COMPANY, CARL K.
BRANAN, and AMERICAN FAMILY
MUTUAL INSURANCE COMPANY,

  Plaintiffs-Appellants,

  v.

NATIONAL FIRE & MARINE
INSURANCE COMPANY,

  Defendant-Appellee.

No. 09-1412

**ORDER**

Before **MURPHY**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

Appellee's petition for rehearing is granted in part for the limited purpose

of removing the last sentence of the first paragraph on page 26 in our original

opinion filed on November 1, 2011.  We remove the sentencing stating: "National

has a duty to defend."  Otherwise, the petition for rehearing is denied.  A copy of

the modified opinion is attached to this order.

The petition for rehearing en banc was transmitted to all of the judges of

the court who are in regular and active service.  No member of the panel and no

judge in regular active service on the court requested that the court be polled on rehearing en banc, so en banc rehearing is denied.

Entered for the Court

Elisabeth A. Shumaker, Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 1, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GREYSTONE CONSTRUCTION, INC., PETER J. HAMILTON, THE BRANAN COMPANY, CARL K. BRANAN, and AMERICAN FAMILY MUTUAL INSURANCE COMPANY,

Plaintiffs-Appellants,

v.

NATIONAL FIRE & MARINE INSURANCE COMPANY,

Defendant-Appellee.

No. 09-1412

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 07-cv-66-MSK-CBS)**

---

L. Kathleen Chaney, Lamdin & Chaney, LLP, Denver, Colorado, for Appellants.

Peter J. Morgan (Evan P. Lee with him on the brief) Baldwin Morgan & Rider, P.C., Denver, Colorado, for Appellee.

---

Before **MURPHY**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

This appeal requires us to consider whether property damage caused by a subcontractor's faulty workmanship is an "occurrence" for purposes of a commercial general liability (CGL) insurance policy. We hold that because damage to property caused by poor workmanship is generally neither expected nor intended, it may qualify under Colorado law as an occurrence and liability coverage should apply.

This issue arises from the appeals by Greystone Construction, Inc., The Branan Company, and American Family Mutual Insurance Company (American) of the district court's grant of summary judgment in favor of National Fire & Marine Insurance Company (National). The district court held National does not owe Greystone and Branan defenses under their commercial general liability (CGL) insurance policies, because the complaints brought against them do not allege covered "occurrences" under the policies' standard terms. According to the district court, the complaints alleged injuries arising from faulty workmanship, and such injuries are not "accidents."

Exercising jurisdiction under 28 U.S.C. § 1291, we VACATE and REMAND for reconsideration.

## I. Background

The relevant facts are undisputed. In June 2001, Richard and Lisa Hull purchased a house built by Greystone, a Denver-area general contractor. Greystone employed subcontractors to perform all work on the house. As is

-2-

common along Colorado's front range, the house was built on soils containing expansive clays. Over time, soil expansion caused the Hulls's foundation to shift, resulting in extensive damage to the home's living areas, including the upper-level living areas, porch, patio, garage, and driveway. This damage was unintended and unanticipated.

The Hulls sued Greystone in 2005 for their damages, asserting defective construction by the subcontractors who installed the foundation. This claim was premised on the theory the house was damaged due to a subcontractor's negligent design and construction of the house's soil-drainage and structural elements, which caused dangerous exposure to shifting soils.

Greystone was insured under CGL policies provided by two insurers. American provided policies for 2001 to 2003, and National provided policies for 2003 to 2006. The American and National policy periods did not overlap. Upon receiving the Hulls's complaint, Greystone tendered a claim to American, which had insured the builder during construction. American defended the builder subject to a reservation of rights under the policy. Shortly afterward, Greystone also tendered the suit to National, which denied it owed Greystone a defense at all.

The other home at issue was purchased by Douglas and Sandra Giorgetta in August 1999. Like Greystone, Branan, the general contractor, hired subcontractors to perform all work on the house. The home's foundation also

shifted as a result of expansive soils. In January 2006, the Giorgettas sued Branan, asserting claims mirroring those the Hulls brought against Greystone. Branan was insured under CGL policies with American for 1998 to 2003, and under CGL policies with National for 2003 to 2005. Once again, American provided a defense subject to a reservation of rights, while National denied it was obligated to defend.

In district court, the builders and American sought to recover a portion of their defense costs from National. The threshold issue was whether property damage resulting from faulty construction was an "occurrence" under the terms of the policies. After discovery, the parties moved for summary judgment on this issue. Relying on a recent Colorado Court of Appeals decision, *General Security Indemnity Co. of Arizona v. Mountain States Mutual Casualty Co.*, 205 P.3d 529 (Colo. App. 2009), the district court awarded summary judgment to National, holding the Hull and Giorgetta complaints do not allege accidents that would trigger covered occurrences under National's policies.

This appeal followed. We sought to certify the question before us to the Colorado Supreme Court, which declined to consider the issue. Then, after oral argument, and in response to *General Security*, the Colorado General Assembly enacted C.R.S. § 13-20-808, which was designed to clarify Colorado law on some of the legal issues involving CGL policies. We then requested and received

-4-

additional briefing on whether the new provision resolves the policy interpretation issue in the appellant's favor as a matter of law.

## II. Discussion

Greystone and the general contractors challenge the district court's summary judgment ruling on two grounds.  First, they contend § 13-20-808 applies to their claims, effectively resolving the policy interpretation issue in their favor.  Second, they assert that regardless of § 13-20-808, the complaints allege covered "occurrences" under the standard terms of the policies.  In response, National asserts § 13-20-808 does not apply to this case, and further that construction defects are not "occurrences" but rather the foreseeable result of poor workmanship, which is not covered by a CGL policy.

We review a district court's decision to grant summary judgment de novo, applying the same legal standard the district court used.  *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  "Summary judgment should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Bowling v. Rector*, 584 F.3d 956, 963–64 (10th Cir. 2009) (internal quotation marks omitted).

## A. Relevant CGL Language

The terms of Greystone's and Branan's CGL policies with National, which are versions of the post-1986 standard-form CGL policy, are identical in all material respects. The policies read:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage"[1] to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply . . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if:
>
>> (1) The "bodily injury" or "property damage" is *caused by an "occurrence"* that takes place in the "coverage territory";
>>
>> (2) The "bodily injury" or "property damage" occurs during the policy period; . . . .

R. at 146–47.

---

[1] "Property damage" is defined in the policies as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

R. at 838.

According to the policies, property damage must arise from an "*occurrence*." An occurrence is defined as "an *accident, including continuous or repeated exposure to substantially the same general harmful conditions*." R. at 147 (emphasis added). The policies do not define the term "accident," but as we discuss below, the term has been considered in a number of Colorado cases. Generally, under Colorado law an accident is "an unanticipated or unusual result flowing from a commonplace cause." *Union Ins. Co. v. Hottenstein*, 83 P.3d 1196, 1201 (Colo. App. 2003) (applying *Carroll v. CUNA Mut. Ins. Soc'y*, 894 P.2d 746, 753 (Colo. 1995)). "[I]t is the 'knowledge and intent of the insured' that make injuries or damages expected or intended rather than accidental." *Hoang v. Monterra Homes LLC*, 129 P.3d 1028 (Colo. App. 2005) (quoting *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1088 (Colo. 1991)).

The policies contain certain business-risk exclusions, the most relevant of which is the "your work" exclusion:

l. "Property damage" to "*your work*"[2] arising out of it or any part of it and included in the "products-completed operations hazard."[3]

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

*Id.*

The policyholders contend the CGL policy language covered the property damage because, even if the damage was caused by faulty workmanship, it arose unforeseeably as a result of a defective foundation that was subject to damage

---

[2] "Your work" is defined in the policies as:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

R. at 839.

[3] The "products-completion operations hazard" is defined in the policies as:

a. [A]ll "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of . . . "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

R. at 838.

from the continuous exposure to harmful soil conditions.  Moreover, under any interpretation of "your work," the exclusion does not apply because all relevant work was completed by subcontractors.

### B.    C.R.S. § 13-20-808

Before considering whether the policies cover the property damage at issue, we must first answer a threshold question: does § 13-20-808, which defines the term "accident" for purposes of Colorado insurance law, apply retroactively to this case?  If it does, faulty workmanship would be covered under the policies. We conclude, however, that § 13-20-808 has no retroactive effect and does not apply to this appeal.[4]

Following the district court's summary judgment ruling and oral argument for this appeal, § 13-20-808 became law.  Section 13-20-808 expressly criticizes *General Security* and establishes an explicit statutory definition of "accident" under Colorado law:

> In interpreting a liability insurance policy issued to a construction professional, a court shall presume that the work of a construction professional that results in property damage, including damage to the work itself or other work, *is an accident unless the property damage is intended and expected by the insured.*  Nothing in this subsection:
>
> (a)  Requires coverage for damage to an insured's own work unless otherwise provided in the insurance policy; or

---

[4] National also contends that a retroactive application of the statute amounts to an unconstitutional impairment of contract.  Because we conclude the provision is prospective only, we need not consider this argument.

(b) Creates insurance coverage that is not included in the insurance policy.

C.R.S. § 13-20-808(3) (emphasis added) (parenthetical omitted). Section 13-20-808 also states: "If an insurance policy provision that appears to grant or restore coverage conflicts with an insurance policy provision that appears to exclude or limit coverage, the court shall construe the insurance policy to favor coverage if reasonably and objectively possible." *Id.* § 13-20-808(5) (parenthetical omitted).

If applicable, § 13-20-808 would settle this appeal. Because the general contractors did not "intend" or "expect" the damage to the houses of the Hulls or Giorgettas, under § 13-20-808 and the CGL policies, the property damage resulted from an "accident" and, therefore, a covered "occurrence."

The question, then, is whether § 13-20-808 applies retroactively. Greystone, Branan, and American contend the new law applies retroactively because it pertains to procedural matters. National disagrees, arguing the statute's language does not evidence the legislature's intent that it operate retroactively.[5] Because § 13-20-808 is a Colorado statute, we must ask how the

---

[5] National also contends that, even if § 13-20-808 applies retroactively, it does not bear on this case because the law does not apply to carriers of surplus line insurance like National. This argument lacks merit and we need not consider at it length. The law broadly defines "insurer" as "every person engaged as principal, indemnitor, surety, or contractor in the business of making contracts of insurance." *See* §§ 13-20-808(2)(b), 10-1-102(13). Nowhere does the statute carve out an exception for carriers of surplus line insurance. Although it is true that surplus line carriers are regulated differently than licensed, admitted carriers in some respects, where the legislature has intended surplus line carriers to be

(continued...)

Colorado Supreme Court would interpret it. "To properly discern the content of state law, we must defer to the most recent decisions of the state's highest court." *Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1295 (10th Cir. 2010) (quotation omitted).

Colorado statutes generally do not apply retroactively and are "presumed to be prospective in operation." C.R.S. § 2-4-202. Accordingly, "[a]bsent legislative intent to the contrary, we presume a statute operates prospectively." *City of Colo. Springs v. Powell*, 156 P.3d 461, 464 (Colo. 2007); *see also In re Estate of DeWitt*, 54 P.3d 849, 854 (Colo. 2002). Nevertheless, "the retroactive application of a statute is not necessarily unconstitutional." *Id.* at 465. The Colorado state constitution prohibits only "*retrospective*" legislation. Colo. Const. art. 2, § 11 (emphasis added). A statute is retrospective if it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Powell*, 156 P.3d at 465 (quotation omitted). This proscription "prevent[s] the unfairness that would otherwise result from changing the consequences of an act after that act has occurred." *Id.*

---

[5](...continued)
exempt from laws pertaining to insurers generally, it has generally said so expressly. *See*, *e.g.*, C.R.S. § 10-5-118. We are aware of no law that bars us from applying § 13-20-808 to the policies at issue.

Thus, deciding whether § 13-20-808 operates retroactively is a two-step inquiry. First, we ask whether the General Assembly intended the provision to operate retroactively. Second, if we ascertain the General Assembly intended retroactivity, we assess whether the challenged statute is unconstitutionally retrospective.

In several cases since the enactment of § 13-20-808, Colorado state courts have suggested the provision does not apply retroactively. *See Martinez v. Mike Wells Constr. Co.*, No. 09cv227 (Colo. Dist. Ct. Mar. 1, 2011) (order) (refusing to apply § 13-20-808 retroactively to provide coverage for construction-defect allegations); *Colo. Pool Sys., Inc. v. Scottsdale Ins. Co.*, No. 09cv836 (Colo. Dist. Ct. Oct. 4, 2010) (order) (refusing to apply § 13-20-808 retroactively to extend coverage under expired insurance policies). *But see Cent. Park Townhomes Condo. Ass'n, Inc. v. Aggregate Indus.*, No. 06cv4013 (Colo. Dist. Ct. Sept. 19, 2010) (order) (finding proper the retroactive application of portions of Colorado's Construction Defect Action Reform Act to procedural and remedial matters).

We agree with the cases refusing to apply § 13-20-808 retroactively. There is no reason to believe the General Assembly intended § 13-20-808 to have retroactive effect. The statute's application provision states: "This act applies to all insurance policies *currently in existence* or issued on or after the effective date of this act." 2010 Colo. Legis. Serv. Ch. 253, § 3 (emphasis added). Given this language, our task is to decide whether "currently in existence" refers to polices

that have been issued and under which coverage can still be obtained—as is the case here—or only to those whose policy periods have not yet expired. *See United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633 F.3d 951, 957–58 (10th Cir. 2011).

A plain reading of the statute supports the latter interpretation. Although § 10-20-808 is somewhat ambiguous, we believe the General Assembly would have more clearly stated its intentions if it desired the "accident" definition to apply retroactively to expired policies that still may be subject to claims for occurrences within the policy period. This interpretation is bolstered by a recent Colorado Supreme Court case that construed the term "existing policy" to refer to policies whose policy period has not yet expired. *See Granite State Ins. Co. v. Ken Caryl Ranch Master Assoc.*, 183 P.3d 563, 564 (Colo. 2008). The story is the same in the statute books, where Colorado insurance provisions typically define an "existing policy" in terms of whether the policy period is still running. *See, e.g.*, 3 CCR 702-4:4-1-4, § 4(C); C.R.S. § 10-4-110.9(3). This makes logical sense. For most policies, when a policy period has expired, new claims are not covered, but any occurrence during the policy period is still covered even if the claim is made after the expiration of the policy. Further, we doubt that the legislature, if it did intend to grant coverage where coverage previously did not

exist, would have left the matter less than crystal clear. Therefore, we hold that § 13-20-808 does not apply retroactively to the claims in this case.[6]

Appellants' argument to the contrary is unpersuasive. Their key case, *Village Homes of Colorado, Inc., v. Travelers Insurance Co.*, 148 P.3d 293 (Colo. App. 2006), addresses a different issue and is therefore inapplicable. In *Village Homes*, the Colorado Court of Appeals held that an "occurrence policy that was in effect when the injury or damage happened may provide coverage even when a claim alleging that the policyholder is liable for the injury or damage is not filed until many years later." *Id.* at 296. Accordingly, "an occurrence policy does not expire but, rather, continues in effect after the policy period ends." *Id.* This is true, but it does not bear on whether § 13-20-808 applies retroactively. The issue in *Village Homes* was whether coverage under the policy was triggered even though the suing homeowners acquired the properties after the expiration of the policy period. *Id.* The court did not purport to resolve the question whether an insurance policy that continues to cover any occurrences arising within the policy period can be modified by legislation after the expiration of the policy period. Thus, *Village Homes* does not bear on whether the legislature intended § 13-20-808 to be retroactive.

---

[6] We recognize the procedural aspects of the Act may have a presumption of retroactivity, but the procedural elements are not at issue here.

-14-

Because we conclude § 13-20-808 does not apply to insurance policies whose policy periods have already expired, the statute does not apply retroactively and does not apply to this appeal.

## C. *"Occurrence" and "Accident"*

Because § 13-20-808 is inapplicable, we must determine whether, under principles of Colorado insurance law, property damage arising from poor workmanship is an "occurrence" under the standard CGL definition.

Although there is no consensus among federal and state courts as to the answer to this question, the Colorado Court of Appeals, in *General Security*, recently addressed the definitions of "occurrence" and "accident" in CGL insurance policies and decided the definition did not generally encompass injuries caused by poor workmanship. The court held that because the term "accident," as used in CGL policies, necessarily implies fortuity, "a claim for damages arising from poor workmanship, standing alone, does not allege an accident that constitutes a covered occurrence . . . ." *General Security*, 205 P.3d at 534.[6] But an occurrence may be found where "additional, consequential property damages [are] alleged as a result of faulty workmanship." *Id.* at 535. Accordingly, because plaintiffs alleged only that faulty workmanship caused damage to the

---

[6] The court explained that absent other property damage "a claim of defective workmanship, standing alone, does not allege an occurrence," but an occurrence may be found where "consequential property damage has been inflicted upon a third party as a result of the insured's activity." *General Security*, 205 P.3d at 535.

builder's work product, the court ruled plaintiffs were not covered by the policy

and the insurer had no duty to defend. *See id.* at 537–38. The court explained

that taking the opposite stance could "improperly shift[] the burdens of a

subcontractor's poor workmanship from the contractor to the [insurer] . . . [and]

dissuade contractors from avoiding unqualified subcontractors because the

[insurers], not the contractors, would pay for the consequences of a

subcontractor's defective workmanship." *Id.* at 536. The district court's grant of

summary judgment in favor of National was based on *General Security*'s holding.

*General Security*'s interpretation is persuasive—and we agree with most of

it—but it is not binding. *United Fire & Cas.*, 633 F.3d at 957. "[W]here

jurisdiction rests solely on diversity of citizenship and there is no controlling

decision by the highest court of a state, a decision by an intermediate court should

be followed by the Federal court, absent convincing evidence that the highest

court would decide otherwise." *Id.* (quotation omitted). But after reviewing

Colorado law, we conclude the Colorado Supreme Court would apply the CGL

policy at issue somewhat differently than the appeals court did in *General

Security*. We predict the Colorado Supreme Court would construe the term

"occurrence," as contained in standard-form CGL policies, to encompass

unforeseeable damage to nondefective property arising from faulty workmanship.

### 1. *Approaches in Other Jurisdictions*

The question before us—whether damage caused by faulty workmanship is an "occurrence" under a standard-form CGL policy—has been the subject of significant debate and litigation across the United States. Jurisdictions have divided on the issue. Because understanding this case law helps to inform the dispute in this case, a brief survey is appropriate.[7]

---

[7] In addition to the cases we discuss, a number of treatises and scholarly articles discuss the issues. *See, e.g.,* Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 129; Eric Mills Holmes, *Holmes' Appleman on Insurance 2d* §§ 129, 132; Harmon S. Graves et al., *Shoddy Work, Negligent Construction, and Reconciling the Irreconcilable under CGL Policies*, 38 Colo. Law., Nov. 2009, at 43; Ron Sandgrund et al., *Recovering Actual Damages Under Colorado's Construction Defect Action Reform Act—Part I*, 38 Colo. Law., May 2009, at 5; Ron Sandgrund et al., *Recovering Actual Damages Under Colorado's Construction Defect Action Reform Act—Part II*, 38 Colo. Law., June 2009, at 6; David Dekker et al., *The Expansion of Insurance Coverage for Defective Construction*, 28 Constr. Law., Fall 2008; Ron Sandgrund & Leslie A. Tuft, *Liability Insurance Coverage for Breach of Contract Damages*, 36 Colo. Law., Feb. 2007, at 39; Christopher Kipper Burke, *Exposing the Faulty Premise: The Insurer's Interpretation of Occurrence Does Not Render the Subcontractor Exception to the Your Work Exclusion Meaningless*, Mealey's Lit. Report: Constr. Defects Ins. Report, December 2005, at 16; Clifford J. Shapiro, *The Good, the Bad, and the Ugly: New State Supreme Court Decisions Address whether an Inadvertent Construction Defect Is an "Occurrence" under CGL Policies*, 25 Constr. Law., Summer 2005; Ron Sandgrund et al., *Theories of Homebuilder Liability for Subcontractor Negligence—Part I*, 34 Colo. Law., June 2005, at 69; Ron Sandgrund et al., *Theories of Homebuilder Liability for Subcontractor Negligence—Part II*, 34 Colo. Law., July 2005, at 55; Clifford J. Shapiro, *Point/Counterpoint: Inadvertent Construction Defects Are an "Occurrence" under CGL Policies*, 22 Constr. Law., Spring 2002; Clifford J. Shapiro & Neil B. Posner, *It Was an Accident: Inadvertent Construction Defects Are an "Occurrence" Under Commercial General Liability Insurance Policies*, 3 J. Ins. Coverage, No. 4, Autumn 2000.

In deciding *General Security*, the Colorado Court of Appeals explained it was joining a "majority" of jurisdictions holding that "general allegations of faulty workmanship [do not] constitute an occurrence," rather than a "minority" of jurisdictions holding that "damage resulting from faulty workmanship is an accident, and thus, a covered occurrence, so long as the insured did not intend the resulting damage." 205 P.3d at 535.

As we see it, however, the cases do not break down so neatly: if anything, most federal circuit and state supreme court cases line up in favor of finding an occurrence in the circumstances we consider here. In fact, a strong recent trend in the case law interprets the term "occurrence" to encompass unanticipated damage to nondefective property resulting from poor workmanship. *See, e.g.*, *Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co.*, 707 S.E.2d 369, 371 (Ga. 2011) (acknowledging a "trend in a growing number of jurisdictions" to cover damage resulting from poor workmanship); *Sheehan Constr. Co. v. Cont'l Cas. Co.*, 935 N.E.2d 160 (Ind. 2010); *Architex Ass'n, Inc. v. Scottsdale Ins. Co.*, 27 So.3d 1148 (Miss. 2010); *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653 (7th Cir. 2010); *Auto Owners Ins. Co. v. Newman*, 684 S.E.2d 541 (S.C. 2009), *clarified by Crossmann Communities of N.C., Inc. v. Harleysville Mut. Ins. Co.*, — S.E.2d —, No. 26909, 2011 WL 3667598, at *3 (S. Ct. S.C. Aug. 22, 2011); *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871 (Fla. 2007); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1 (Tex. 2007); *French v.*

*Assurance Co. of Am.*, 448 F.3d 693 (4th Cir. 2006); *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 137 P.3d 486 (Kan. 2006); *Great Am. Ins. Co. v. Woodside Homes Corp.*, 448 F. Supp. 2d 1275 (D. Utah 2006); *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65 (Wis. 2004); *Fejes v. Alaska Ins. Co.*, 984 P.2d 519 (Alaska 1999). These cases generally hold that damage caused by faulty workmanship is neither expected nor intended from the standpoint of the policyholders and, therefore, receives coverage so long as it does not fall under a policy exclusion. As the Texas Supreme Court explained, "a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is, the result would have been different had the deliberate act been performed correctly." *Lamar Homes*, 242 S.W.3d at 8.

We recognize, however, that other courts conclude that damage to a contractor's work arising from defective construction can never constitute a covered occurrence. *See, e.g.*, *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69 (Ky. 2010); *Essex Ins. Co. v. Holder*, 261 S.W.3d 456 (Ark. 2007); *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888 (Pa. 2006); *Auto-Owners Ins. Co. v. Home Pride Cos.*, 684 N.W.2d 571 (Neb. 2004); *Corder v. William W. Smith Excavating Co.*, 556 S.E.2d 77 (W. Va. 2001); *Oak Crest Constr. Co. v. Austin Mut. Ins. Co.*, 998 P.2d 1254 (Or. 2000); *Pursell Constr., Inc. v. Hawkeye-Security Ins. Co.*, 596 N.W.2d 67 (Iowa 1999); *Heile v. Herrmann*, 736 N.E.2d 566, 568 (Ohio Ct. App. 1999). These courts

generally construe the term "accident" narrowly to cover only truly fortuitous occurrences—a category that does not include unanticipated damages arising from faulty workmanship. Some of these jurisdictions do allow recovery, however, when the faulty workmanship injures a third party or results in damage to property other than the work itself. *See, e.g.*, *Essex Ins. Co.*, 261 S.W.3d at 459–60. These cases define "occurrence" based on *who* was injured, and not on *what caused* the injury. As explained below, this view subdivides "occurrence" into two camps. This subdivision of the definition renders the "your work" exception superfluous, the subcontractor exception unnecessary, and therefore creates a fundamental inconsistency with the logic of CGL policies.

### 2. Duty to Defend

Under Colorado law, we construe insurance policies using general principles of contract interpretation. *See Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1090 (Colo. 1991). Thus, absent indication by the parties to the contrary, a policy's language must be construed in accordance with the plain meaning of the words used. *See Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008). And in determining the meaning of a policy, we must "interpret a contract in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless." *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009) (quotation marks omitted); *see also Level 3 Commc'ns*, 535 F.3d at

1154. Finally, "because of the unique nature of insurance contracts and the relationship between the insurer and insured, [we] construe ambiguous provisions against the insurer and in favor of providing coverage to the insured." *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003); *see also Dish Network Corp. v. Arch Specialty Ins.*, — F.3d —, No. 10-1445, at \*10–12 (10th Cir. 2011).

In this case, we are addressing the "duty to defend"—an insurer's affirmative duty to defend its policyholders against pending claims. *Constitution Assocs. v. N.H. Ins. Co.*, 930 P.2d 556, 563 (Colo. 1996). The duty to defend is broader than the duty to indemnify. *Dish Network Corp.*, at \*9–10. Under Colorado law,

> [a]n insurer seeking to avoid its duty to defend an insured bears a heavy burden. An insurer's duty to defend arises when the underlying complaint against the insurer alleges any facts that might fall within the coverage of the policy. . . . Where the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim.

*Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613–14 (Colo. 1999) (internal quotation marks and brackets omitted). "In order to avoid policy coverage, an insurer must establish that [an] exemption . . . applies in the particular case, and

that the exclusions are not subject to any other reasonable interpretation."  *Id.* at 614.

### 3.  *"Occurrence," "Accident," and the CGL Policies at Issue*

We conclude the CGL policies at issue may cover damage to nondefective property arising from poor workmanship.  In our view, the policyholders' complaints adequately allege an "accident" that fits within the policies' definition of a covered "occurrence."  Accordingly, we hold that injuries flowing from improper or faulty workmanship constitute an occurrence so long as the resulting damage is to nondefective property, and is caused without expectation or foresight.  As we explain further below, nondefective property is property that has been damaged as a result of poor workmanship.  But determining whether faulty workmanship was anticipated or accidental requires an inquiry into the facts and circumstances of the particular case.  Our approach to this issue reconciles *General Security*'s concerns regarding over-broad application of CGL policies with the CGL policies' actual language, which provides coverage to nondefective property that is damaged as a result of subcontractor work.

In *General Security*, the Colorado Court of Appeals concluded that an "accident" requires an element of "fortuity."  *See* 205 P.3d at 535.  In light of other Colorado precedents, this is an overly narrow view of CGL-policy language and is inconsistent with the inherent structure of CGL policies.  Although the term "accident" certainly incorporates a "fortuitous event," *McGowan v. State Farm Fire & Cas. Co.*, 100 P.3d 521, 525 (Colo. App. 2004), it also incorporates

"an *unanticipated* or *unusual result* flowing from a commonplace cause," *see Hottenstein*, 83 P.3d at 1201 (applying *Carroll*, 894 P.2d at 753) (emphasis added). Therefore, fortuity is not the sole prerequisite to finding an accident under a CGL policy. To the contrary, an *unanticipated* or *unforeseeable* injury to person or property—even in the absence of true fortuity—may be an accident and, therefore, a covered occurrence. *See Hoang*, 129 P.3d at 1034 ("[I]t is the knowledge and intent of the insured that make injuries . . . expected or intended rather than accidental."); *see also The Oxford English Dictionary* 74 (2d Ed. 1989) (defining accident as "[a]nything that happens without foresight or expectation"); *Black's Law Dictionary* 15 (7th ed. 1999) (noting that "[t]he word 'accident,' in accident policies, means an event which takes place without one's foresight or expectation"). This formulation aligns with the CGL policies' definition of an "accident," which includes "continuous or repeated exposure to substantially the same harmful conditions." R. at 147. Thus, if the physical damage was unforeseeable and resulted from poor workmanship (which in this case was exacerbated by the continuous exposure to harmful conditions), then the exposure would constitute an accident, and therefore an occurrence, even though it did not necessarily occur by chance.

A 1991 Colorado Supreme Court decision, *Hecla Mining Co. v. New Hampshire Insurance Co.*, 811 P.2d at 1083, confirms our view that the

unexpected damage caused by the shifting soils was a covered "occurrence."[8] The

case arose under a previous (but similar) version of a standard-form CGL policy,

after an insurer denied it had a duty to defend its policyholders in an action for

damages for pollution arising from the policyholders' mining activities. *Id.* at

1085. The policy in *Hecla Mining* defined "occurrence" as "an accident,

including continuous or repeated exposure to conditions, which result in bodily

injury or property damage, neither expected nor intended from the standpoint of

the insured." *Id.* at 1086. Thus, the definition was substantially similar, although

slightly more restrictive, to that of the post-1986 occurrence definition at issue

here. Even though the policyholders did not contend the damage was fortuitous,

the Colorado Supreme Court found the damages were covered because the term

"occurrence" excludes from coverage only "those damages that the insured *knew*

*would flow directly and immediately from its intentional act.*" *Id.* at 1088

(emphasis added). Under this interpretation, foreseeability, rather than fortuity, is

the *sine qua non* of an occurrence. We see no reason the Colorado Supreme

Court would significantly narrow the definition of "occurrence" for post-1986

policies.[9]

---

[8] Although it focused on a pre-1986 standard-form CGL policy, we nevertheless find *Hecla Mining*'s analysis indicative of how the Colorado Supreme Court would address the policies at issue in the instant case.

[9] In *Adair Group, Inc. v. St. Paul Fire & Marine Insurance Co.*, 477 F.3d 1186, 1188 (10th Cir. 2007), we held that deficient performance by a

(continued...)

In assessing whether damage caused by poor workmanship was foreseeable, we ask whether damages would have been foreseeable if the builder and his subcontractors had completed the work properly. Any other approach renders the doctrine illogical. This is because, by definition, only damage caused by purposeful neglect or knowingly poor workmanship is foreseeable; a correctly installed shingle does not ordinarily fall, and a correctly installed window does not ordinarily leak. *See, e.g.*, *Sheehan Constr. Co.*, 935 N.E.2d at 170 ("[I]f the faulty workmanship was the product of unintentional conduct then we start with the assumption . . . that the work on the . . . homes would be completed properly."); *Travelers Indemnity Co. of Amer.,* 216 S.W.3d at 308–09 (same). CGL policies are meant to cover unforeseeable damages—a category that encompasses faulty workmanship that leads to physical damage of nondefective property.

Here, the property damage—for example, the movement of the basement floor and damage to the upper living areas—allegedly resulted from the house's exposure to expansive soils, which was not otherwise prevented due to the subcontractor's poor design and construction of the house's soil-drainage and

[9](...continued)
subcontractor was not in itself an event triggering application of a CGL policy. The appellant sought "indemnity for the construction deficiencies alone, not for any consequent or resultant damages flowing from the poor workmanship." *Id.* Because the appellants in this case allege consequential damages (to nondefective portions of the property) flowing from the poor workmanship of a subcontractor, *Adair* is not applicable here.

structural elements. National does not contend the exposure to the expansive soils or the resulting damage was intended or anticipated by the policyholders. For these reasons, we find the damage suffered by the homeowners may have resulted from an unforeseen occurrence: the damage caused by the faulty workmanship that failed to account for exposure to expansive soils. The damage suffered was "an unanticipated or unusual result flowing from a commonplace cause." *See Hottenstein*, 83 P.3d at 1201. There is simply no allegation the appellants knew the property damage "would flow directly and immediately from [] intentional act[s]" of the subcontractors. *Hecla Mining*, 811 P.2d at 1088. Accordingly, we find that the damage to nondefective property could be covered under the insurance policies and, because the work was completed by subcontractors, the "your work" exclusion does not apply.

We do note, however, that CGL policies implicitly distinguish between damage to nondefective work product and damage to defective work product. In this case, the homes' soil-drainage and structural elements were potentially defective. The potential defects in these aspects of the construction may have caused damage to the homes themselves—the nondefective work product. In line with the Fourth Circuit's holding in *French v. Assurance Co. of America*, 448 F.3d at 703, the logic of CGL policies require us to conclude that the damage to the homes is covered, while the damage to the soil-drainage and structural elements is not. The obligation to repair defective work is neither unexpected nor

-26-

unforeseen under the terms of the construction contract or the CGL policies.

Therefore, repairing the foundations represents an economic loss that does not

trigger a duty to defend under the CGL policies. *See id.*

Conversely, when a subcontractor's faulty workmanship causes unexpected

property damage to otherwise nondefective portions of the builder's work, the

policies provide coverage. In this scenario, there is simply no anticipation that

damage will occur. Thus, damage solely to nondefective work, caused by a

subcontractor's faulty workmanship, may be an "accident" or "occurrence."[10] *Cf.*

---

[10] There is another, independent, reason to adhere to this defective-nondefective property distinction. As relevant to this case, CGL policies provide coverage only for "property damage," which includes "physical injury" to property or "loss of use" of property. R. at 838. Interpreting this provision, the Supreme Court of South Carolina observed correctly that "the critical phrase is 'physical injury,' which suggests the property was not defective at the outset, but rather was initially proper and injured thereafter." *Crossmann Communities of N.C., Inc. v. Harleysville Mut. Ins. Co.*, — S.E.2d —, No. 26909, 2011 WL 3667598, at *3 (S. Ct. S.C. Aug. 22, 2011); *see also J.S.U.B., Inc.*, 979 So. 2d at 889 (citing cases and recognizing the "difference between a claim for the costs of repairing or removing defective work, which is not a claim for 'property damage,' and a claim for the costs of repairing damage caused by the defective work, which is a claim for 'property damage'"); *Wm. C. Vick Constr. Co. v. Pa. Nat'l Mut. Cas. Ins. Co.*, 52 F. Supp. 2d 569, 582 (E.D.N.C. 1999) ("[T]he property allegedly damaged has to have been undamaged or uninjured at some previous point in time."), *aff'd*, 213 F.3d 634 (4th Cir. 2000) (unpublished table decision); *Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 311 (Tenn. 2007) ("[W]e hold that claims alleging only damages for replacement of a defective component or correction of faulty installation do not allege 'property damage.'"). This is an important point, because the existence of property damage is a threshold issue. Without property damage, it is irrelevant whether there was an "occurrence" or "accident." Under this theory, we need not even consider whether a policyholder may recover the costs of repairing defective property, when the defects were caused by faulty workmanship.

*Newman*, 684 S.E.2d at 541, *clarified by Crossmann Communities of N.C.*, 2011 WL 3667598, at *3 (supporting this interpretation on similar grounds).

This interpretation is also consistent with the logic behind *General Security*'s "corollary rule" that injury to third-party property may be covered. 205 P.3d at 535; *see also J.Z.G. Resources, Inc. v. King*, 987 F.2d 98, 102 (2d Cir. 1993); *Home Pride Cos.*, 684 N.W.2d at 578–79. The defective-nondefective principle flows from the recognition that the faulty workmanship, standing alone, is not caused by an accident—but that damage to *other* property caused by the faulty workmanship (including both the nondefective work product of the contractor and third-party property) *is* the result of an accident.

### 4. *Rationale and History of CGL Policies*

Our interpretation of "accident," "occurrence," and the business-risk exclusions are consonant with the rationale and history of CGL policies. National contends the cost to repair and replace the damage caused by faulty workmanship is a business risk not covered under a CGL policy. It also asserts that adopting the appellants' interpretation would effectively make an insurer the guarantor of the policyholders' work product. These arguments are unconvincing.

First, we note that even though CGL policies initially provide coverage for some traditional business risks, the policies' exclusions effectively eliminate coverage for many of these business risks, including (in some instances) the cost of repairing damage to the contractor's own work. *See Sheehan,* 935 N.E.2d at

-28-

169. This structural aspect of CGL policies mitigates much of National's concern that a broad interpretation of "occurrences" and "accidents" would inappropriately provide coverage for business risks.

In addition, the evolution of CGL-policy language shows that the current standard-form policy, which was used in the present case, was specifically designed to provide general contractors with at least some insurance coverage for damage caused by the faulty workmanship of their subcontractors. For example, the 1973 version of the standard-form CGL policy contained expansive business-risk exclusions that, unlike those in the current version, did not include an exception for damage resulting from a subcontractor's work. *See French*, 448 F.3d at 700. Because subcontractors were becoming increasingly integral to the completion of construction projects, however, many contractors became unhappy with the standard provisions. *See Am. Girl, Inc.*, 673 N.W.2d at 83; *see also* 9A Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 129:18 (3d ed.) ("Due to the increasing use of subcontractors on construction projects, many general contractors were not satisfied with the lack of coverage provided under [the 1973 CGL] commercial general liability policies where the general contractor was not directly responsible for the defective work."). As a result, in the mid-1970s, insurers introduced policies whereby contractors could pay a higher premium to obtain a specific endorsement—known as the Broad Form Property Damage Endorsement (BFPD)—that effectively extended coverage to damage arising out

of a subcontractor's work. *Id.* at 701. Still, before 1986, the CGL business-risk exclusions precluded coverage for damage to construction projects caused by subcontractors.

In 1986, however, the subcontractor-exception aspect of the BFPD was directly added to the body of standard-form CGL policies, in the form of the subcontractor exception to the "your work" exclusion. *Id.* "This resulted both because of the demands of the policyholder community (which wanted this sort of coverage) and the view of insurers that the CGL was a more attractive product that could be better sold if it contained this coverage." 2 Jeffrey W. Stempel, *Stempel on Insurance Contracts* § 14.13[D] (2007). Accordingly, the language included in the 1986 revision to CGL insurance policies covered some construction-defect claims arising from the work of subcontractors. *See, e.g.*, Clifford J. Shapiro, *Point/Counterpoint: Inadvertent Construction Defects Are an "Occurrence" under CGL Policies*, 22 Constr. Law., Spring 2001, at 44 ("The better-reasoned decisions give effect to the actual intent of CGL insurance by holding that construction-defect claims allege an 'occurrence' . . . ."). Indeed, as the Supreme Court of Texas observed, "[b]y incorporating the subcontractor exception into the 'your-work' exclusion, the insurance industry specifically contemplated coverage for property damage caused by a subcontractor's defective performance." *Lamar Homes*, 242 S.W.3d at 12. Thus, the degree of business risk that is covered by a CGL policy is a negotiated agreement between

-30-

contractual parties, which should not be disturbed by a court's view of whether business-risk coverage is appropriate. Insurers are of course free to amend CGL agreements or offer riders so as to reallocate the risk of subcontractor negligence. *See, e.g.*, *J.S.U.B.*, 979 So. 2d at 981 ("[I]f the insurer decides that this is a risk it does not want to insure, it can clearly amend the policy to exclude coverage, as can be done simply by either eliminating the subcontractor exception or adding a breach of contract exclusion."); *Lamar Homes*, 242 S.W.3d at 12 ("More recently, the Insurance Services Office has issued an endorsement that may be included in the CGL to eliminate the subcontractor exception to the 'your-work' exclusion.").

Finally, we note that interpreting a CGL policy so as to provide coverage for a subcontractor's faulty workmanship does not transform the policy into a performance bond. "[A]n insurance policy spreads the contractor's risk while a bond guarantees its performance. An insurance policy is issued based on an evaluation of risks and losses that is actuarially linked to premiums; that is, losses are expected. In contrast, a surety bond is underwritten based on what amounts to a credit evaluation of the particular contractor and its capabilities to perform its contracts, with the expectation that no losses will occur. Unlike insurance, the performance bond offers no indemnity for the contractor; it protects only the owner." *Id.* at 10 n.7. And even if the CGL policy does share some characteristics of a performance bond, that alone is an insufficient reason to ignore the plain language and intent of the policy.

-31-

For all of these reasons, we find the property damage alleged here may result from an occurrence triggering a duty to defend the policyholder.

### C. *"Your Work" Exclusion*

There is another reason why we reach this conclusion. To the extent that *General Security* forecloses coverage for damage to nondefective property caused by the work of a subcontractor, its approach renders the "your work" exclusion a phantom. As we have explained, the CGL policies exclude coverage for damage to "work or operations performed by you or on your behalf," but the exclusion does not apply "if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." R. at 147. The idea is that an insurer should not have to assume the business risks of the builder, unless the work is performed by a subcontractor.

Exclusions play an important role in CGL insurance policies. Structurally, a CGL policy "begin[s] with a broad grant of coverage, which is then limited in scope by exclusions. Exceptions to exclusions narrow the scope of the exclusion and, as a consequence, add back coverage. But it is the initial broad grant of coverage, not the exception to the exclusion, that ultimately creates (or does not create) the coverage sought." David Dekker et al., *The Expansion of Insurance Coverage for Defective Construction*, 28 Constr. Law., Fall 2008, at 19–20. As the Wisconsin Supreme Court explained, "CGL policies generally do not cover contract claims arising out of the insured's defective work or product, but this is

by operation of the CGL's business risk exclusions, not because a loss actionable only in contract can never be the result of an 'occurrence' within the meaning of the CGL's initial grant of coverage." *Am. Girl, Inc.*, 673 N.W.2d at 76.

Given this structure of CGL policies, the policyholders correctly contend the "your work" exclusion and the subcontractor exception are illusory if damages to the contractor's nondefective work product—whether caused by poor workmanship or otherwise—are not covered in the first place. In *General Security*, the Colorado Court of Appeals held that damage to the builder's work caused by a builder (or its subcontractor) is not covered under the initial, broad grant of coverage. It also held, however, that damage to third parties or their property *is* an occurrence covered in the initial grant of coverage. Under this formulation, the "your work" exclusion does no work at all. If damage to "your work arising out of it or any part of it" can never be covered in the first instance, there would be no justification for the "your work" exclusion and the subcontractor exception. And this cannot be. Like the Supreme Court of Florida, "[w]e reject any definition of 'occurrence' that renders damage to the insured's own work as a result of a subcontractor's faulty workmanship expected, but renders damage to property of a third party caused by the same faulty workmanship unexpected." *See U.S. Fire Ins. Co.*, 979 So.2d at 885.

The "your work" exclusion simply must have some effect. And the only way it has effect is if we find that physical injury caused by poor workmanship—

whether to some part of the work itself or third-party property—may be an occurrence under standard CGL policies. Accordingly, we agree with the Indiana Supreme Court that "[i]f the insuring provisions do not confer an initial grant of coverage, then there would be no reasons for a 'your work' exclusion." *Sheehan Constr. Co.,* 935 N.E.2d at 171. Likewise, the exclusion's exception for property damage arising out of the work of a subcontractor necessitates the conclusion that damage to the builder's work caused by the poor workmanship of a subcontractor can constitute an occurrence in the first instance. *Id.*; *Lamar Homes*, 242 S.W.3d at 12 ("By incorporating the subcontractor exception into the 'your-work' exclusion, the insurance industry specifically contemplated coverage for property damage caused by a subcontractor's defective performance."); *Great Am. Ins. Co.*, 448 F. Supp. 2d at 1282 ("[I]t is undeniable that excluding faulty subcontractor work from the definition of 'occurrence' would reduce the operation of the subcontractor exception so drastically that the language would virtually cease to be of any meaningful effect."). Therefore, we conclude that damage to the contractor's nondefective work—even if arising out of poor workmanship—may fall under the CGL policy's initial grant of coverage, even though coverage may ultimately be withdrawn through one of the policy's exclusions.

In summary, we find that damage arising from a poor workmanship may fall under a CGL policy's initial grant of coverage, even though recovery may still be precluded by a business-risk exclusion or another provision of the policy.

-34-

### D.    *Other Exclusions*

The district court granted National summary judgment without evaluating

the effect of the exclusions appended to the standard terms of Greystone's and

Branan's policies.  National contends the appended exclusions provide alternative

grounds for affirming the district court's summary judgment decision.  In

response, appellants contend the appended exclusions do not support summary

judgment because (1) the "complaint" rule[11] bars their consideration, (2) the

exclusions are either inapplicable or void as against public policy, and (3)

genuine issues of material fact exist concerning their operation.

We decline to consider the appended-exclusions issue.  Because the district

court did not address the effect of the appended exclusions in its summary

judgment order, we leave the issue to the district court on remand.  "[T]he better

practice on issues raised [below] but not ruled on by the district court is to leave

the matter to the district court in the first instance."  *Apartment Inv. & Mgmt. Co.*

*v. Nutmeg Ins. Co.*, 593 F.3d 1188, 1198 (10th Cir. 2010) (quotation marks and

brackets omitted); *see also Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221,

1238 (10th Cir. 2005) ("Where an issue has been raised, but not ruled on, proper

---

[11] "Under the complaint rule, the insurer's duty to defend is determined by examination of solely the policy and the complaint." *Pompa v. Am. Family Mut. Ins. Co.*, 520 F.3d 1139, 1145 (10th Cir. 2008); *see also Dish Network Corp.*, No. 10-1445, at *9–10.

judicial administration generally favors remand for the district court to examine the issue initially.").

### III.  Conclusion

For the foregoing reasons, we VACATE the district court's summary judgment decision and REMAND for reconsideration in light of this opinion. Further, we DENY Homeowners Against Deficient Dwellings' motion to appear as amicus curiae and file an amicus brief.