# IN THE SUPREME COURT OF IOWA

No. 14–1274

Filed June 10, 2016

**NATIONAL SURETY CORPORATION,** an Illinois Corporation,

Appellant,

vs.

**WESTLAKE INVESTMENTS, LLC,** an Iowa Limited Liability Company,

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Robert B. Hanson (summary judgment) and Eliza J. Ovrom (summary judgment and trial), Judges.

An insurer seeks further review of a court of appeals decision affirming in part a district court judgment finding it liable under the terms of an excess commercial general liability insurance policy for property damage arising due to defective workmanship by the insureds' subcontractor. **DECISION OF THE COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH INSTRUCTIONS.**

Todd S. Schenk and Amber Coisman of Tressler LLP, Chicago, Illinois, and Mollie Pawlosky of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellant.

Todd M. Lantz of Weinhardt & Logan, P.C., and Stephen R. Eckley of Belin McCormick, P.C., Des Moines, for appellee.

Jeffrey A. Stone of Simmons Perrine Moyer Bergman PLC, Cedar Rapids, for amici curiae Hubbell Realty Company, Home Builders Association of Iowa, and Associated Builders & Contractors of Iowa.

Brenda K. Wallrichs of Lederer Weston Craig PLC, Cedar Rapids, for amici curiae American Insurance Association and Property Casualty Insurers Association of America.

**WIGGINS, Justice.**

An insurer sought a declaratory judgment stating it was not liable to the assignee of an excess commercial general liability (CGL) insurance policy for damages awarded to the assignee in federal district court. The assignee brought a counterclaim against the insurer for breach of contract. A jury concluded the insurer was liable to the assignee for the damages under the excess CGL policy. On appeal, the court of appeals affirmed the verdict against the insurer but reversed the district court award of prejudgment interest and remanded the case to the district court with instructions. The insurer sought further review, which we granted. On further review, we affirm the court of appeals decision affirming the district court judgment. We conclude the district court did not err in instructing the jury to determine whether the claimed damages arose due to an "accident" constituting an "occurrence" under the policy by considering "the viewpoint of the insureds and what they intended or should reasonably have expected." Additionally, we conclude the district court did not err in ruling defective work performed by an insured's subcontractor may constitute an occurrence under the policy. The court of appeals decision will stand as the final decision of this court with respect to all other issues raised on appeal.

## I. Background Facts and Proceedings.

In 2002, developers and a general contractor began construction on an apartment complex in West Des Moines. In the spring of 2003, while the complex was still under construction, Westlake Investments, LLC, (Westlake) entered into negotiations to purchase it. In June, Westlake executed a purchase agreement.

That summer, the developers and general contractor (the insureds) purchased a primary CGL insurance policy with a $1,000,000 policy

limit from Arch Insurance Group (Arch) and an excess CGL insurance policy with a $20,000,000 policy limit from National Surety Corporation (NSC). The terms of the Arch policy defined the scope of coverage under the NSC policy, as the NSC policy followed the form of and incorporated by reference the terms, conditions, and exclusions of the Arch policy. Both policies became effective on July 1, 2003, and expired on July 1, 2004.

During construction, numerous problems surfaced within the complex, including visible water penetration issues in several buildings. These problems did not hamper the sale to Westlake because the parties believed them to be aesthetic. However, that turned out not to be true. After the sale closed in November 2003, the construction defects throughout the complex continued to cause widespread water penetration issues.

In February 2008, Westlake sued the insureds in federal district court, seeking to recover lost profits, repair costs, and other damages under tort and contract theories. The insureds in turn sued numerous third-party defendants, including the architect who designed the complex and the subcontractors who helped to construct it.

As the primary insurer, Arch defended the suit on behalf of the insureds. After extensive pretrial litigation and discovery, Westlake and the insureds entered into settlement negotiations. Those negotiations culminated in a settlement agreement between Westlake, the insureds, and all but one of the subcontractors in September 2011. *See Westlake Invs., LLC v. MLP Mgmt., LLC*, 842 F. Supp. 2d 1121–25 (S.D. Iowa 2012).

In February 2012, the federal district court entered a consent judgment for $15,600,000 in favor of Westlake. Arch contributed $1,000,000 (the policy limit on the primary CGL policy) toward

satisfaction of the judgment, and the third-party defendants contributed $1,737,500. Following these contributions, $12,762,500 awarded in the judgment remained unsatisfied. Pursuant to the settlement agreement, the insureds assigned their claims against NSC on the excess CGL policy to Westlake.

In October 2011, shortly after the parties agreed to settle but before the federal district court entered the consent judgment against the insureds, NSC initiated this declaratory judgment action in state district court. Specifically, NSC sought entry of a declaration stating it had no obligation under the NSC policy to pay any portion of the judgment awarded to Westlake. Westlake counterclaimed for breach of contract and sought entry of a declaration stating the NSC policy obligated NSC to pay Westlake the unsatisfied portion of any judgment awarded to Westlake.

Following discovery, Westlake and NSC filed competing motions for summary judgment on various grounds, one of which is relevant to this appeal. Westlake argued property damage resulting from defective work performed by an insured's subcontractor may constitute an accident that qualifies as an occurrence covered by the Arch policy (and therefore the NSC policy). In response, NSC argued property damage caused by defective workmanship does not constitute an accident or an occurrence under a CGL insurance policy.

Following a hearing, the district court granted Westlake's motion for partial summary judgment and denied NSC's motion for summary judgment. The district court concluded property damage resulting from defective work performed by an insured's subcontractor may constitute an accident and an occurrence under a post-1986 CGL insurance policy written to a general contractor.

The case proceeded to a jury trial in March 2014. Over the course of three weeks, the jury heard testimony from numerous witnesses, and the district court admitted hundreds of exhibits. At the close of the evidence, both parties moved for a directed verdict. The court denied both motions and declined to disturb its summary judgment ruling that property damage resulting from defective work performed by an insured's subcontractor may constitute an accident and an occurrence under the Arch policy.

Before the district court submitted the case to the jury, both parties objected to several jury instructions. Of particular relevance to this appeal, NSC objected to the jury instruction defining the terms "accident" and "occurrence" on the ground that the meaning of the term "accident" is objective rather than subjective. Accordingly, NSC proposed an instruction on the meaning of the term "occurrence" that defined the term "accident" as "an undesigned, sudden and unexpected event."

The district court overruled all the objections to the jury instructions, noting its instruction on the meaning of the term "occurrence" relied on cases cited by both parties and concluding the instruction represented an accurate statement of Iowa law. Thus, the following jury instructions were among those the court submitted to the jury:

### Instruction No. 19

[T]o prove the National Surety policy covers the consent judgment damages, Westlake must show that:

1. Some or all of the consent judgment damages resulted from "property damage" that was caused by an "occurrence," and

2. Some or all of the consent judgment damages resulted from "property damage" that happened between July 1, 2003 and July 1, 2004.

**Instruction No. 20**

As used in Instruction No. 19, "property damage" means physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it.

You are instructed that property damage happened at the Westlake apartment complex at some point in time due to water intrusion. You must determine whether property damage happened during the policy period of July 1, 2003 to July 1, 2004.

**Instruction No. 21**

As used in Instruction No. 19, an "occurrence" is an accident, including continuous or repeated exposure to substantially the same general harmful conditions. Defective construction work performed by an insured is not covered by the policy; however, defective construction work performed by subcontractors may be an "occurrence" under the policy.

"Accident" means an unplanned, sudden, and unexpected event.

Whether something is an "accident" must be determined from the viewpoint of the insureds and what they intended or should reasonably have expected. An accident is unexpected so long as the insured does not expect both it and some damage.

The jury deliberated for just over an hour before returning a verdict in favor of Westlake. Following the jury verdict, the district court entered a judgment awarding Westlake $12,439,500 with interest accruing at the statutory rate from the date of the filing of the counterclaim.[1]

Westlake moved to amend the judgment with respect to prejudgment and postjudgment interest. Westlake argued the prejudgment interest on the damages awarded in the declaratory

---

[1]The judgment awarded by the district court reflected the portion of the consent judgment award that remained unsatisfied when the declaratory judgment was entered. By the time the declaratory judgment was entered, Westlake had been awarded an additional $253,000 following a bench trial to determine the liability of the subcontractor who declined to join in the settlement agreement.

judgment action properly accrued from the date the federal suit settled rather than the date the counterclaim in the declaratory judgment action was filed on the theory that the damages became liquidated damages when the parties settled. Westlake also requested an order clarifying the postjudgment interest on the damages awarded in the declaratory judgment action would accrue at the rate of five percent under Iowa Code section 535.2 (2013).

The district court denied the motions. First, the court concluded the damages awarded in the consent judgment in the underlying action were not liquidated until the jury in the declaratory judgment action found them to be reasonable. Accordingly, the court determined prejudgment interest on the damages awarded in the declaratory judgment action accrued from the date Westlake filed its counterclaim, not the date the parties settled the underlying federal suit. The ruling did not expressly state which Iowa Code section governed the rate at which prejudgment interest accrued, however. Second, the court determined Iowa Code section 535.3 properly governed the rate at which postjudgment interest on the damages awarded in the declaratory judgment action would accrue.

Meanwhile, NSC moved for a judgment notwithstanding the verdict, arguing once again that property damage caused by defective workmanship does not constitute an accident or an occurrence under Iowa law. NSC also moved for a new trial asserting the verdict was contrary to law and not supported by substantial evidence. Westlake resisted the motions.

Following oral argument, the district court denied both motions, finding there was substantial evidence in the record to support the jury finding that Westlake's damages resulted from property damage

occurring within the policy period. NSC filed an expedited motion to enlarge and amend the district court ruling, requesting the district court to specifically rule on additional arguments raised in its posttrial motions. The district court denied the motion, but its ruling specified additional grounds for its denial of the posttrial motions.

NSC appealed. NSC argued the district court erroneously instructed the jury as to the meaning of the term "occurrence" because construction defects and resulting damage never constitute an occurrence under Iowa law. NSC also contended the court erroneously denied its motion for a new trial, arguing the jury did not deliberate before making its findings, the jury findings were not supported by substantial evidence, and the jury verdict was internally inconsistent. Finally, NSC asserted the court abused its discretion in declining to submit two proposed jury instructions to the jury.

In response, Westlake argued the district court correctly permitted the jury to decide the occurrence issue and correctly denied the motion for new trial. Westlake also cross-appealed, arguing the court erroneously denied its motion to amend the judgment regarding prejudgment interest.

We transferred the appeal to the court of appeals. The court of appeals affirmed the district court rulings on NSC's posttrial motions, concluding the district court did not err in instructing the jury regarding the meaning of the term "occurrence." The court of appeals also rejected NSC's arguments that the jury did not deliberate, the jury findings were not supported by substantial evidence, and the jury verdict was internally inconsistent. On cross-appeal, the court of appeals concluded the district court correctly determined the date from which prejudgment interest on the damages awarded in the declaratory judgment action

accrued but failed to specify the applicable statutory default interest rate in its ruling. The court of appeals thus reversed the district court ruling on prejudgment interest and remanded the case for entry of a supplemental judgment specifying Iowa Code section 535.2(1)(*a*) set the rate at which the prejudgment interest accrued.

NSC sought further review, which we granted.

## II. Issues.

On further review, we may exercise our discretion to review all the issues raised on appeal or in the application for further review or only a portion thereof. *Gits Mfg. Co. v. Frank*, 855 N.W.2d 195, 197 (Iowa 2014). In this case, we exercise that discretion to consider only whether the district court erroneously instructed the jury as to what constitutes an occurrence covered by the Arch policy language incorporated by reference into the NSC policy. To decide this question, we must determine whether property damage caused by defective work performed by an insured's subcontractor may constitute an accident, and therefore an occurrence, for which coverage exists under the policy language included in post-1986 standard-form CGL insurance policies. The court of appeals decision will stand as the final decision of this court with respect to all other issues raised on appeal. *Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 770 (Iowa 2009).

## III. Scope of Review.

When a party challenges a jury instruction on the ground that the instruction was erroneous, we review the instruction for correction of errors at law. *Anderson v. State*, 692 N.W.2d 360, 363 (Iowa 2005). In contrast, we review a district court ruling refusing to give a requested instruction for an abuse of discretion. *Id.*

To the extent our review of a district court ruling rests upon its interpretation of an insurance policy, we ordinarily review that interpretation for correction of errors at law. *Boelman v. Grinnell Mut. Reins. Co.*, 826 N.W.2d 494, 500 (Iowa 2013).

We likewise review a district court ruling denying a motion for a directed verdict for correction of errors at law. *Crow v. Simpson*, 871 N.W.2d 98, 105 (Iowa 2015).

**IV. The Policy Language.**

The NSC policy contains the following insuring agreement:

> This coverage only applies to injury or damage covered by the **Primary Insurance**. The definitions, terms, conditions, limitations and exclusions of the **Primary Policies**, in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with provisions of this policy or relate to premium, subrogation, other insurance, an obligation to investigate or defend, the amount or limits or insurance, payment of expenses, cancellation or any renewal agreement.

> Subject to the other provisions of this policy, **We** will pay on behalf of the **Insured** those sums in excess of **Primary Insurance** that the **Insured** becomes legally obligated to pay as damages. . . .

> If a **Primary Policy** applies on the basis of injury or damage which occurs during the period of that policy, then this coverage shall only apply on the same basis and in a like manner to injury or damage which occurs during **Our** Policy Period.

The NSC policy also identified the Arch policy as the "primary policy." Accordingly, NSC acknowledges the NSC policy followed the form of and incorporated by reference certain terms, conditions, and exclusions of the Arch policy, including those defining the scope of the coverage it afforded the insureds.[2]

---

[2]It is common for an excess insurance policy providing coverage in addition to that provided by an underlying primary insurance policy to "follow the form" of and

The NSC policy incorporated the following insuring agreement in the Arch policy:

> We will pay those sums . . . that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . . This insurance applies only to "bodily injury" and "property damage" which occurs during the policy period. The "bodily injury" and "property damage" must be caused by an "occurrence."

The NSC policy also incorporated the following definitions appearing in the Arch policy:

> *"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.*
>
> . . . .
>
> "Property damage" means:
>
> a.   Physical injury to tangible properly, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of physical injury that caused it; or
>
> b.   Loss of use of tangible property that is not physically injured. All such loss will be deemed to occur at the time of the "occurrence" that caused it. . . .

(Emphasis added.) Although the term "accident" appeared in the definition of the term "occurrence" in the Arch policy, neither the Arch policy nor the NSC policy explicitly defined it.

---

incorporate the scope of coverage afforded under the primary policy. 4 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* § 11:542, Westlaw (database updated Mar. 2016). However, the extent to which the scope of coverage afforded by a follow-form excess policy mirrors that of the underlying primary policy ultimately depends upon the language it contains. *Id.* In this case, the parties do not dispute which terms of the Arch policy defined the scope of coverage afforded under the NSC policy.

The NSC policy also incorporated the following exclusions from coverage appearing in the Arch policy, each of which is relevant to this appeal:

This insurance does not apply to:

**a.    Expected or Intended Injury**

"Bodily injury" or "property damage" *expected or intended from the standpoint of the insured. . . .*

. . . .

**j.    Damage to Property**

"Property damage" to:

. . . .

(5)    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6)    That particular part of any property that must be restored, repaired, or replaced because "your work" was incorrectly performed on it.

. . . .

*Paragraph (6) of this exclusion does not apply to "property damage included in the "products–completed operations hazard.*

. . . .

**l.    Damage to "your work"**

"Property damage" to "your work" arising out of it or any part of it and included in the "products–completed operation hazard."

*This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.*

**m.** **Damage to lmpaired Property or Property Not Physically lnjured**

> . . . .
>
> This exclusion does not apply to the loss of use of other property arising out of *sudden and accidental* physical injury to "your product" or "your work" after it has been put to its intended use.

(Emphasis added.)

The NSC policy incorporated the following definition of the phrase "your work" appearing in the Arch policy:

> "Your work":
>
> a.    Means:
>
>> (1)    Work or operations performed by you or on your behalf, and
>>
>> (2)    Materials, parts, or equipment furnished in connection with such work or operations. . . .

Finally, the NSC policy incorporated the following endorsement addressing "property damage to construction projects" from the Arch policy:

> This insurance does not apply to property damage to the "project" or any party of the "project" that occurs during the course of construction.  The project or part of the project will be deemed to be within the course of construction until it satisfies the definition of "products-completed operations hazard" as defined in this endorsement.
>
> . . . .
>
> a.    *"Products-completed operations hazard" includes all "bodily injury" and "property damage" arising out of "your product" or "your work" except:*
>
>> i.    Products that are still in your physical possession; or
>>
>> ii.    *Work that has not yet [been] completed or abandoned.*

b. "Your work" will be deemed completed at the earliest of the following times:

    i. Completion and acceptance of the entire "project" by all parties designated in its construction agreement;

    ii. When all of the work to be done at the site has been completed if the "project" calls for work at more than one site;

    iii. When that part of the work done at the "project" has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same "project;" or [sic]

*Work that may need service maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.*

(Emphasis added.)

With the exception of the endorsement defining the scope of the "products-completed operations hazard" under the Arch policy, the terms of the Arch policy relevant to this appeal mirror those appearing in the 1986 standard-form CGL policy drafted by the Insurance Services Office, Inc. (ISO). ISO is an association of domestic property and casualty insurers that develops standard-form policies widely used in the insurance industry. *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 772, 113 S. Ct. 2891, 2896, 125 L. Ed. 2d 612, 623 (1993). As the Supreme Court has noted, "most CGL insurance written in the United States is written on these forms." *Id.* Today, virtually every contractor in the construction industry carries a CGL policy that is substantially identical to one of the ISO's standard-form CGL policies. *See* James Duffy O'Connor, *What Every Court Should Know About Insurance Coverage for Defective Construction,* 5 J. Am. C. Constr. Law. No. 1, at 1, 1 (2011) [hereinafter O'Connor].

## V. Interpretive Principles.

In order to determine whether the district court erred, we must determine the meaning of the policy language governing the scope of coverage afforded by the NSC policy. We therefore begin our analysis by describing the principles that guide our interpretation of insurance policies.

When we interpret an insurance policy, we determine the meaning of the words that govern its legal effect. *See Thomas v. Progressive Cas. Ins. Co.*, 749 N.W.2d 678, 681 (Iowa 2008). The cardinal principle guiding our interpretation is that the intent of the parties at the time the policy was sold controls. *LeMars Mut. Ins. Co. v. Joffer*, 574 N.W.2d 303, 307 (Iowa 1998). To determine the parties' intent, we look to the language of the policy unless the meaning of that language is ambiguous. *Id.* When the language of the policy is ambiguous, we adopt the construction most favorable to the insured. *Boelman*, 826 N.W.2d at 502. Because insurance policies are contracts of adhesion, an insurer assumes a duty to define in clear and explicit terms any limitations or exclusions to the scope of coverage a policy affords. *Id.* Nevertheless, where no ambiguity exists, we will not write a new policy to impose liability on the insurer. *Id.*

The mere fact that parties disagree as to the meaning of terms in an insurance policy does not establish the policy is ambiguous. *Id.* Rather, we determine whether an insurance policy is ambiguous by applying an objective test. *Id.* at 501. Policy language is ambiguous when, considered in the context of the policy as a whole, it is susceptible to two plausible interpretations. *Id.* Thus, we determine whether an ambiguity exists not by examining clauses seriatim, but by interpreting

the policy in its entirety, including all endorsements, declarations, or riders attached. *Id.* at 501–02.

When interpreting an insurance policy, we give each policy term not defined in the policy its ordinary meaning. *Id.* at 501. We determine the ordinary meaning of the words in an insurance policy from the standpoint of a reasonable ordinary person, not from the standpoint of a specialist or an expert. *Grinnell Mut. Reins. Co. v. Jungling*, 654 N.W.2d 530, 536 (Iowa 2002). We strive to interpret every term in an insurance policy in a manner that will not render it superfluous unless it is evident that adopting an interpretation giving meaning to a term would be unreasonable when we consider the term in context. *Kibbee v. State Farm Fire & Cas. Co.*, 525 N.W.2d 866, 869 (Iowa 1994).

**VI. Analysis.**

The district court instructed the jury that the term "accident" means "an unplanned, sudden, and unexpected event . . . determined from the viewpoint of the insureds and what they intended or should reasonably have expected." The court provided the jury a separate instruction stating, "Defective construction work performed by an insured is not covered by the policy; however, defective construction work performed by subcontractors may be an 'occurrence' under the policy."

Before the court submitted the case to the jury, NSC objected to the jury instruction defining the terms "accident" and "occurrence." Specifically, NSC proposed a jury instruction defining an accident as "an undesigned, sudden and unexpected event" and argued the term should be interpreted objectively. NSC subsequently moved for a directed verdict, arguing that defective workmanship does not constitute an accident or an occurrence under controlling Iowa law. On appeal, NSC

argued the district court erroneously instructed the jury as to the meaning of "occurrence" because construction defects and resulting damage never constitute an occurrence.[3]

We first consider whether the district court erroneously instructed the jury to determine whether an accident occurred by considering "the viewpoint of the insureds and what they intended or should reasonably have expected." We previously concluded an intentional act resulting in unexpected and unintended property damage qualifies as an accident that amounts to an occurrence covered by a CGL policy so long as the insured did not expect and intend both the act itself and the resulting harm in *West Bend Mutual Insurance Co. v. Iowa Iron Works, Inc.*, 503 N.W.2d 596, 600–01 (Iowa 1993).

The standard-form CGL policy we interpreted in *West Bend* defined the term "occurrence" as "an accident, including continuous or repeated

---

[3]The jury instruction NSC proposed on the meaning of "occurrence" did not explicitly exclude *all* property damage arising due to defective construction. In relevant part, it stated,

> To establish that the "property damage" was caused by an "occurrence," Westlake must prove that reasonable and prudent parties in the positions of [the insureds] did not know of or expect, and should not have known of or expected, property damage resulting from defective construction. You do not, however, have to find that [the insureds] knew of, expected or should have known of, or should have expected, the full extent of the damages resulting from the defective construction in order to find there was no "occurrence."

NSC requested a separate instruction that stated,

> Damages resulting from "property damage" to the Westlake apartments caused by defective construction are not caused by "occurrence." Westlake must prove by a preponderance of the evidence that the property damage was not caused by defective construction.

Westlake argues NSC waived its argument that property damage caused by defective workmanship never constitutes an occurrence by requesting neither a jury instruction reflecting this theory nor a judgment in its favor on this basis. For purposes of our analysis, we assume without deciding that NSC preserved error.

exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.* at 600. In contrast, the modern standard-form CGL policy upon which the Arch policy was based defines the term "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." However, it also contains an exclusion and an exception to an exclusion particularly relevant to the meaning of the term "accident." Namely, it contains an exclusion from coverage for property damage "expected or intended from the standpoint of the insured"[4] and an exception to an exclusion from coverage assuring the insured may collect certain damages "arising out of sudden and accidental physical injury" to work product in limited circumstances.[5]

An undefined term in an insurance policy must be construed in light of the entire policy, including any exclusions. *See Boelman*, 826 N.W.2d at 501–02. Hence, we previously recognized a CGL policy containing an exclusion precluding coverage for damage "expected or intended from the standpoint of the insured" relies on the "common definition" of the term "accident" as "an unexpected and unintended event." *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 652 (Iowa 2002) (quoting *Weber v. IMT Ins. Co.*, 462 N.W.2d 283, 287 (Iowa 1990)). Moreover, we previously found the use of the words "sudden and accidental" in a CGL insurance policy forecloses any interpretation of the term "sudden" that would render that term redundant in light of our interpretation of the term "accidental." *Iowa*

---

[4]See exclusion (a) reproduced in section IV of this opinion.

[5]See exclusion (m) reproduced in section IV of this opinion.

*Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Farmland Mut. Ins. Co.*, 568 N.W.2d 815, 818 (Iowa 1997).

Applying the same logic, we conclude that in the context of a modern standard-form CGL policy containing an exclusion precluding coverage for property damage "expected or intended from the standpoint of the insured," the term "accident" means "an unexpected and unintended event." *See Shelly Funeral Home*, 642 N.W.2d at 652; *cf.* 4 Douglas L. Patin, *Law & Practice of Insurance Coverage Litigation* § 45:9, Westlaw (database updated July 2015) (concluding "there is no significant difference" between the definition of "occurrence" contained in the 1973 and 1986 standard-form CGL policies). An intentional act resulting in property damage the insured did not expect or intend qualifies as an accident amounting to an occurrence as defined in a modern standard-form CGL policy so long as the insured did not expect and intend both the act itself and the resulting property damage. *See W. Bend Mut.*, 503 N.W.2d at 600–01.

Considered from the standpoint of the insured, "a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is, the result would have been different had the deliberate act been performed correctly." *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007); *see Shelly Funeral Home*, 642 N.W.2d at 653 (rejecting the argument that "the standpoint of the insured is irrelevant" in determining whether an accident constituting an occurrence triggering CGL coverage took place). Accordingly, an intentional act does not constitute an accident that qualifies as an occurrence covered by a modern standard-form CGL policy when the resulting harm "was the natural and expected result of the insured's actions, that is, was highly probable whether the insured

was negligent or not." *Lamar Homes*, 242 S.W.3d at 9; *see Shelly Funeral Home*, 642 N.W.2d at 653–55 (concluding injuries resulting from an insured's negligent supervision of an employee constituted an occurrence because the insured did not know harmful consequences would flow from its own acts or omissions).

Accordingly, we conclude the district court correctly instructed the jury to determine whether the claimed damages arose due to an accident that constituted an occurrence eligible for coverage under the insuring agreement in the Arch policy by considering "the viewpoint of the insureds and what they intended or should reasonably have expected."[6] Whether an event amounts to an accident that constitutes an occurrence triggering coverage under a modern standard-form CGL policy turns on whether the event itself and the resulting harm were both "expected or intended from the standpoint of the insured."

We next consider whether the district court erroneously denied NSC's motion for directed verdict. The court denied NSC's motion because it concluded defective work performed by an insured's subcontractor may constitute an occurrence under the Arch policy. NSC claims defective workmanship cannot constitute an accident or an occurrence as a matter of law.

---

[6]Though the jury instruction defined "accident" as "an unplanned, sudden, and unexpected event" rather than "an unexpected and unintended event," we need not consider whether the district court's inclusion of a temporal component in this definition was erroneous because NSC's proposed instruction on the meaning of "occurrence" defined "accident" to mean "an undesigned, sudden and unexpected event." In any event, we note that ongoing exposure to harmful conditions appears to qualify as an accident that constitutes an occurrence covered by the Arch policy, as the policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The cornerstone of NSC's argument that defective workmanship never constitutes an accident or an occurrence under Iowa law is *Pursell Construction v. Hawkeye-Security Insurance*, 596 N.W.2d 67 (Iowa 1999). In *Pursell*, we considered whether a CGL policy covered damages arising from breach-of-contract and negligence claims brought against an insured who failed to construct two houses in a floodplain at the elevation required by city ordinance, thereby causing the houses to be uninhabitable. *Id.* at 68. We treated the claim against the insurer as one for the cost of repairing the insured's own defective workmanship, as the claimed damages were the cost of raising the elevation of the houses by approximately two feet. *Id.* at 68, 70. We concluded the policy did not cover the cost of repairing an insured's own defective work product because "defective workmanship standing alone, that is, resulting in damages only to the work product itself, is not an occurrence under a CGL policy." *Id.* at 71. In arriving at this conclusion, we reasoned that interpreting the policy to cover repairs to the insured's own defective workmanship would convert the insurer into "a guarantor of the insured's performance" on a contract, causing the policy to take on "the attributes of a performance bond." *Id.* (quoting *U.S. Fid. & Guar. Corp. v. Advance Roofing & Supply Co.*, 788 P.2d 1227, 1233 (Ariz. Ct. App. 1989)).

For several reasons, we reject NSC's argument that *Pursell* is controlling in this case. First, determining whether defective work performed by an insured's subcontractor may constitute an occurrence covered by the Arch policy requires us to consider the entire policy before us, including its relevant exceptions and exclusions. *See Boelman*, 826 N.W.2d at 501–02. Notably, the standard-form CGL policy upon which the Arch policy was based defines the term "occurrence" as "an accident,

including continuous or repeated exposure to substantially the same general harmful conditions," but it does not define the term "accident." Interpreting an undefined term in an insuring agreement requires us to determine whether the term is ambiguous in the context of the policy as a whole. *Id.* Consequently, interpreting the insuring agreement in the Arch policy requires us to evaluate the meaning of the term "accident" in the context of the policy as a whole. In *Pursell,* we did not address whether language contained in the exceptions and exclusions appearing in the body of the policy created any ambiguity with respect to the meaning of the term "accident." *See* 596 N.W.2d at 69–70.

Relatedly, *Pursell* is factually distinguishable from the present case. In *Pursell,* the contractor who performed the defective work was the insured. *Id.* at 68. The only damage alleged to have resulted from the defective work was the cost of repairing the insured's own defective work product. *Id.* at 68, 70–71. In contrast, Westlake proved defective installation of the building wrap and flashings resulted in water penetration that caused widespread consequential damage to interior building components that were not defective, including the wood framing, drywall, insulation, carpet, nails, staples, and other metal fasteners inside the walls.[7] Westlake also established the defective work that led to the claimed damages was performed by insureds' subcontractors, not the insureds themselves.

---

[7]NSC argues the damages in the consent judgment included the cost of removing and reinstalling the defectively installed building wrap and flashings. However, Westlake established this defective work product resulted from defective work performed by the insureds' subcontractors, not the insureds themselves. In addition, Westlake presented evidence demonstrating water penetration caused widespread consequential physical damage to interior building components *underneath* the building wrap and flashings such that removing the building envelope was a necessary step in repairing the consequential damage to other parts of the complex.

Most importantly, our holding in *Pursell* was limited by its plain language to situations in which the insured performed defective work and sought coverage for the cost of repairing the defective work product. *Id.* at 71. By implication, *Pursell* anticipated that a CGL policy might provide coverage for at least some claims arising from defective construction, just not claims seeking coverage for repairing or replacing the insured's own defective work product.[8]

Finally, although we have never explicitly overruled *Pursell*, we later interpreted identical language defining the terms "accident" and "occurrence" in a CGL policy to cover compensatory damages awarded based on an insured's negligent supervision in *Shelly Funeral Home*. 642 N.W.2d at 653. As here, the claim we considered in *Shelly Funeral Home* stemmed from a suit against an insured in which one third party who was not a party to an insurance contract sought damages against the insured for harm caused by another third party who worked under the insured's supervision. *Id.* at 651. Because the policy explicitly precluded coverage for harm "expected or intended from the standpoint of the insured," we reasoned, it relied upon "the common definition" of the term "accident" as an "unexpected and unintended" event. *Id.* at 652–53 (citing *Weber*, 462 N.W.2d at 287). We therefore determined harm resulting from the insured's negligent supervision of an employee constituted an occurrence for which there was coverage under the policy's insuring agreement because the insured did not expect or intend the harmful consequences that flowed from its own acts or omissions.

---

[8]Because NSC does not dispute that the damage to the apartment complex resulted from the insureds' subcontractors' defective workmanship, we need not consider whether property damage arising due to the insured's own defective workmanship may constitute an occurrence in the context of a modern standard-form CGL policy containing the exclusions the Arch policy contains.

*Id.* at 653–54. We concluded that when "an injury occurs without the agency of the insured, it may be logically termed 'accidental,' even though it may be brought about designedly by another person." *Id.* at 654 (quoting *Silverball Amusement, Inc. v. Utah Home Fire Ins. Co.*, 842 F. Supp. 1151, 1157–58 (W.D. Ark.), *aff'd*, 33 F.3d 1476 (8th Cir. 1994)).

Our holding in *Shelly Funeral Home* calls into question the applicability of the holding NSC relies upon in the context of the claim before us.[9] NSC essentially argues the claimed damages arose due to the insureds' negligent supervision of the subcontractors whose defective workmanship resulted in damage to the Westlake complex.

We are unable to identify any case in which this court previously considered the question of whether defective work negligently performed by an insured's subcontractor may constitute an occurrence covered by a modern standard-form CGL policy. Our past cases considering whether defective workmanship constituted an occurrence triggering coverage under an insurance policy based on the modern standard-form CGL policy under Iowa law involved defective work performed by the insured, not the insured's subcontractor. *See Pursell*, 596 N.W.2d at 68; *Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 101 (Iowa 1995); *see also Liberty Mut. Ins. Co. v. Pella Corp.*, 650 F.3d 1161, 1164 (8th Cir. 2011).

---

[9]We need not decide whether to overrule *Pursell* to decide the case before us, as the damages Westlake claims arose because defective work performed by the insureds' subcontractors caused extensive property damage to the complex. We note many courts that have concluded defective workmanship does not constitute an occurrence under circumstances similar to those we considered in *Pursell* have subsequently concluded defective workmanship performed by an insured's subcontractor may constitute an occurrence covered by the insuring agreement in a modern standard-form CGL policy. *See, e.g.*, *Sheehan Constr. Co. v. Cont'l Cas. Co.*, 935 N.E.2d 160, 170 (Ind. 2010); *Architex Ass'n, Inc. v. Scottsdale Ins. Co.*, 27 So. 3d 1148, 1157–61 (Miss. 2010); *Auto Owners Ins. Co. v. Newman*, 684 S.E.2d 541, 544–45 (S.C. 2009); *Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 308, 310–11 (Tenn. 2007); *Lamar Homes*, 242 S.W.3d at 8–12; *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 75–78, 84 (Wis. 2004).

NSC argues the exceptions and exclusions the Arch policy contains are irrelevant to the question of what qualifies for coverage under its insuring agreement. We disagree.

To determine if an insurance policy affords coverage under a particular set of circumstances, we generally look first to the insuring agreement, then to the exclusions and the exceptions to the exclusions. *Pursell*, 596 N.W.2d at 69. But before we can construe the language in an insuring agreement, we must first determine whether it is ambiguous. *See Boelman*, 826 N.W.2d at 501. In making that determination, our analysis begins with consideration of the policy as a whole. *See id.* at 501–02. Thus, although exceptions and exclusions cannot "create coverage that otherwise is lacking" under an insuring agreement, they offer insight into whether coverage exists under an insuring agreement by shedding light on what the terms it contains mean. *Amish Connection, Inc. v. State Farm Fire & Cas. Co.*, 861 N.W.2d 230, 239 (Iowa 2015) (quoting *Hartford Cas. Ins. Co. v. Evansville Vanderburgh, Pub. Library*, 860 N.E.2d 636, 646 (Ind. Ct. App. 2007)); *see U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 886 (Fla. 2007); *Sheehan Constr. Co. v. Cont'l Cas. Co.*, 935 N.E.2d 160, 171 (Ind. 2010).

Reading the Arch policy as a whole, we conclude it plainly contemplates coverage for some property damage caused by defective work performed by an insured's subcontractor. In short, interpreting the term "accident" or the term "occurrence" so narrowly as to preclude coverage for all property damage arising from negligent work performed by an insured's subcontractor would be unreasonable in light of the exceptions and exclusions the Arch policy contains.

For example, the policy's "damage to property" exclusion generally excludes from coverage property damage to the "particular part of any

property that must be restored, repaired, or replaced" due to work "incorrectly performed on it" by or on behalf of the insured.[10] Nonetheless, this exclusion does not apply to property damage included within the policy's definition of "products-completed operations hazard." Thus, property damage requiring property to be restored, repaired, or replaced due to work incorrectly performed on it by or on behalf of the insured is generally not excluded from coverage if the property damage arises out of completed work.[11]   18 *New Appleman on Insurance Law Library Edition* § 18.03[13][iv], at 18-91 (Jeffrey E. Thomas & Francis J. Mootz, III, eds., 2015); *see Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 81–82 (Wis. 2004).

Similarly, the policy's "your work" exclusion generally excludes from coverage property damage arising out of completed work performed by or on behalf of the insured.[12]   However, the exclusion contains an exception indicating property damage to work performed on behalf of the insured remains compensable assuming no other coverage exclusion applies if it was performed by the insured's subcontractor.  Specifically, it states the "your work" exclusion does not apply if "the damaged work or the work out of which the damage arises was performed . . . by a subcontractor" on behalf of the insured.[13]   The effect of this subcontractor exception to the "your work" exclusion is to preserve

---

[10]*See* exclusion (j)(6) and paragraph (a)(1) of the definition of "your work" reproduced in section IV of this opinion.

[11]*See* exclusion (j)(6), the exception to exclusion (j)(6), and the definition of the "products-completed operations hazard" reproduced in section IV of this opinion.

[12]*See* exclusion (*l*), paragraph (a)(1) in the definition of "your work," and the definition of the "products-completed operations hazard" reproduced in section IV of this opinion.

[13]*See* the exception to exclusion (*l*) reproduced in section IV of this opinion.

coverage the "your work" exclusion would otherwise negate. *K & L Homes, Inc. v. Am. Family Mut. Ins. Co.*, 829 N.W.2d 724, 737 (N.D. 2013) (quoting *Lamar Homes*, 242 S.W.3d at 12); *see* 18 *New Appleman on Insurance Law Library Edition* § 18.03[12][d], at 18-95.

It would be illogical for an insurance policy to contain an exclusion negating coverage its insuring agreement did not actually provide or an exception to an exclusion restoring it. *See Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1287 (10th Cir. 2011); *J.S.U.B.*, 979 So. 2d at 880; *Sheehan Constr.*, 935 N.E.2d at 171; *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 137 P.3d 486, 494 (Kan. 2006); *Architex Ass'n, Inc. v. Scottsdale Ins. Co.*, 27 So. 3d 1148, 1161 (Miss. 2010). Just as we will not strain to interpret an insurance policy to impose liability on an insurer, we will not strain to interpret an insurance policy to deprive an insured of coverage the policy clearly contemplates. *See Boelman*, 826 N.W.2d at 501–02. Nor will we interpret an insurance policy in a manner that renders an exception or exclusion it contains to be superfluous unless it is evident interpreting the policy to give meaning to a particular exception or exclusion would be unreasonable in the context of the structure and format of the policy as a whole. *Cf. Kibbee*, 525 N.W.2d at 869.

We think a reasonable ordinary person who read the modern standard-form CGL policy containing the subcontractor exception to the "your work" exclusion in its entirety would believe it covered defective work performed by the insured's subcontractor unless the resulting property damage was specifically precluded from coverage by an exclusion or endorsement. *See Jungling*, 654 N.W.2d at 536. Accordingly, we interpret the insuring agreement in the modern standard-form CGL policy as providing coverage for property damage

arising out of defective work performed by an insured's subcontractor unless the resulting property damage is specifically precluded from coverage by an exclusion or endorsement. In addition, we conclude the defective work performed by the insureds' subcontractors falls within the definition of "occurrence" in the insuring agreement appearing in the Arch policy.

Our conclusion that the insuring agreement in a modern standard-form CGL policy ordinarily covers property damage arising due to defective workmanship by an insured's subcontractor is reinforced by both the nature of the ISO's standard-form CGL policy and its evolution. The purpose of CGL policies used in the home-construction industry is to protect homebuilders from risks associated with homeowners asserting postconstruction claims for damage to homes caused by alleged construction defects. *Auto Owners Ins. Co. v. Newman*, 684 S.E.2d 541, 545 (S.C. 2009). Construction-specific exclusions narrow the scope of coverage afforded by standard-form CGL policies and exclude from coverage property damage associated with certain categories of risks. *Id.* Over time, the language contained in the insuring agreements and the exclusions appearing in standard-form CGL policies have been periodically updated to adjust the scope of coverage such policies afford.

The precursor to the modern standard-form CGL policy was promulgated in 1940 and subsequently underwent five principal revisions, the most recent of which occurred in 1986. *Sheehan Constr.*, 935 N.E.2d at 162. Unlike the 1986 version of the standard-form CGL policy upon which the Arch policy was based, prior versions of the standard-form CGL policy contained an exclusion precluding coverage for "property damage to work performed by or *on behalf of the* named insured arising out of the work or any portion thereof, or out of

materials, parts or equipment furnished in connection therewith." *Id.* (quoting *French v. Assurance Co. of Am.*, 448 F.3d 693, 700 (4th Cir. 2006)). Courts interpreted the language of this "work performed" exclusion to preclude from coverage property damage resulting from work performed by an insured's subcontractor, including damage to the insured's own work. *See French*, 448 F.3d at 700. As subcontractors grew increasingly integral to the construction industry, however, many general contractors became unhappy with the scope of coverage provided under standard-form CGL policies. *Greystone*, 661 F.3d at 1287. "General contractors needed coverage for property damage that arose from the work of their subcontractors, a risk they could not control by the exercise of general supervision and coordination." O'Connor, 5 J. Am. C. Constr. Law., no. 1, at 5.

The insurance industry responded by offering two versions of an optional broad form property damage (BFPD) endorsement intended to narrow the "work performed" exclusion. Scott C. Turner, *Insurance Coverage of Construction Disputes* § 3:8, Westlaw (database updated June 2016). With respect to ongoing work, both versions of the endorsement narrowed the "work performed" exclusion to preclude coverage only for "that particular part" of the ongoing work that was defective, rather than "any portion" of the insured's ongoing work. *Id.* With respect to completed work, one version of the endorsement also eliminated the "on behalf of" language from the "work performed" exclusion. *Id.* The elimination of this language effectively extended liability coverage under a CGL policy including the endorsement to damage arising out of work performed by an insured's subcontractor. *Greystone*, 661 F.3d at 1288.

By the mid-1970s, insureds were paying higher premiums to add the latter endorsement to their CGL policies in order to extend their CGL coverage to damage arising out of their subcontractors' work. *See id.*; *French*, 448 F.3d at 701. By 1986, the BFPD endorsement extending liability coverage to work performed by subcontractors was so popular that the ISO incorporated it directly into the body of its standard-form CGL policy in the form of a subcontractor exception to the "your work" exclusion. *See* O'Connor, 5 J. Am. C. Constr. Law., no. 1, at 5. "This resulted both because of the demands of the policyholder community . . . and the view of insurers that the CGL was a more attractive product that could be better sold if it contained this coverage." *Greystone*, 661 F.3d at 1288 (quoting 2 Jeffrey W. Stempel, *Stempel on Insurance Contracts* § 14.13[D] (2007)).

Following the 1986 revisions to its standard-form CGL policy, the ISO broadcast to both the construction and insurance industries that the revisions were intended to extend CGL coverage under standard-form policies to property damage arising from defective construction. O'Connor, 5 J. Am. C. Constr. Law., no. 1, at 5–6. In a circular intended to provide guidance regarding the impact of the 1986 revisions, the ISO confirmed their effect was to provide coverage for "damage caused by faulty workmanship to other parts of work in progress; and damage to, or caused by, a subcontractor's work after the insured's operations are completed." *J.S.U.B.*, 979 So. 2d at 879 (quoting Insurance Services Office Circular, Commercial General Liability Program Instructions Pamphlet, No. GL–86–204 (July 15, 1986)).

The history of the standard-form CGL policy and the industry's own interpretative literature over the course of that history confirm that our interpretation of the insuring agreement in the Arch policy is correct.

Of course, "CGL policy provisions have a special meaning within the insurance industry, which includes the insurance brokers and risk managers who advise contractors, real estate developers, and others within the construction industry as to what CGL coverage to purchase." Turner, *Insurance Coverage of Construction Disputes* § 3:8. Clearly, the 1986 standard-form CGL policy upon which the Arch policy was based "was specifically designed to provide general contractors with at least some insurance coverage for damage caused by the faulty workmanship of their subcontractors." *Greystone*, 661 F.3d at 1287. Consequently, our conclusion that defective work performed by an insured's subcontractor may constitute an occurrence triggering coverage under the modern standard-form CGL policy reflects the overwhelming trend among courts and commentators interpreting such policies. *See, e.g., Greystone*, 661 F.3d at 1290 (applying Colorado law); *French*, 448 F.3d at 706 (applying Maryland law); *J.S.U.B.*, 979 So. 2d at 888 (Florida); *Sheehan Constr.*, 935 N.E.2d at 171 (Indiana); *Lee Builders*, 137 P.3d at 495 (Kansas); *Architex*, 27 So. 3d at 1161 (Mississippi); *K & L Homes*, 829 N.W.2d at 736 (North Dakota); *Auto Owners Ins.*, 684 S.E.2d at 544 (South Carolina); *Lamar Homes*, 242 S.W.3d at 11; *Travelers Indem.*, 216 S.W.3d at 310 (Tennessee); *Am. Girl*, 673 N.W.2d at 83–84 (Wisconsin); *see also* Turner, *Insurance Coverage of Construction Disputes* § 33:9 (listing cases and commentators interpreting standard-form CGL policies to cover property damage caused by subcontractor work in light of the subcontractor exception to the "your work" exclusion).

Finally, our decision is further reinforced by recent decisions of other state supreme courts interpreting CGL policies containing the subcontractor exception to the "your work" exclusion in the context of property damage arising when exposure to moisture resulted from

defective workmanship. *Sheehan Constr.*, 935 N.E.2d at 171–72; *Lee Builders*, 137 P.3d at 489, 494; *Travelers Indem.*, 216 S.W.3d at 304, 306.

In particular, the Indiana Supreme Court recently determined a CGL policy containing the subcontractor exception to the "your work" exclusion covered water damage caused by the defective work of the insured's subcontractors. *Sheehan Constr.*, 935 N.E.2d at 163–64. The defective workmanship included,

> lack of adequate flashing and quality caulking around the windows, lack of a weather resistant barrier behind the brick veneer to protect the wood components of the wall, improperly installed roofing shingles, improperly flashed or sealed openings for the chimney and vents, and inadequate ventilation in the crawl space.

*Id.* at 163. The court concluded the question of whether repair or replacement of "leaking windows, fungus growth on the siding, decayed OSB sheathing, deteriorating and decaying floor joists, and . . . water stained carpeting" was covered under the policy turned on whether the defective workmanship was "intentional from the viewpoint of the insured." *Id.* at 163, 169–72. In arriving at this conclusion, the court noted,

> A shingle falling and injuring a person is a natural consequence of an improperly installed shingle just as water damage is a natural consequence of an improperly installed window. If we assume that either the shingle or the window installation will be completed negligently, it is foreseeable that damages will result. If, however, we assume that the installation of both the shingle and the window will be completed properly, then neither the falling shingle nor the water penetration is foreseeable and both events are "accidents."

*Id.* at 170 (quoting *Travelers Indem.*, 216 S.W.3d at 309).

Similarly, the Kansas Supreme Court recently determined a CGL policy containing the subcontractor exception to the "your work"

exclusion covered property damage caused by continuous exposure to moisture arising due to faulty materials and workmanship provided by the insured's subcontractor because the resulting damage was "both unforeseen and unintended." *Lee Builders*, 137 P.3d at 489–91, 495. In doing so, the court reasoned that clearly distinguishing between what constituted an occurrence and what did not was the obligation of the insurer who drafted the policy. *Id.* at 495. Accordingly, the court determined coverage existed in part because, even if the court were to assume the policy language defining an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" was ambiguous, it was required to construe such ambiguity against the insurer. *Id.*

Likewise, the Tennessee Supreme Court recently determined property damage arising due to water penetration resulting from an insured's subcontractor's faulty installation of windows constituted an occurrence covered by a CGL policy containing the subcontractor exception to the "your work" exclusion. *Travelers Indem.*, 216 S.W.3d at 304, 306. The court rejected the insurer's argument that water penetration was not unforeseen or unexpected from the standpoint of the insured because it was a natural consequence of faulty window installation. *Id.* at 308. Interpreting the term "accident" in a manner that would exclude from coverage all property damage arising from negligence, the court reasoned, would render CGL policies "almost meaningless." *Id.* Accordingly, the court compared water penetration caused by defective window installation "to the automobile accident that is caused by the faulty tire." *Id.* at 310. The court thus concluded the property damage resulting from water penetration constituted an occurrence covered by the policy because the insured could not have

foreseen the water penetration if the work had been completed properly. *Id.* at 311.

As the United States Court of Appeals for the Tenth Circuit has observed, "the degree of business risk that is covered by a CGL policy is a negotiated agreement between contractual parties, which should not be disturbed by a court's view of whether business-risk coverage is appropriate." *Greystone*, 661 F.3d at 1288. Insurers know how to modify the allocation of risk in CGL policies should they wish to do so. *See id.*; *J.S.U.B.*, 979 So. 2d at 891; *see also Lamar Homes*, 242 S.W.3d at 12; 18 *New Appleman on Insurance Law Library Edition* § 18.03[12][d], at 18-95. Therefore, we decline to interpret the ambiguous insuring agreement in the Arch policy to preclude coverage for the property damage Westlake claimed. *See Boelman*, 826 N.W.2d at 502.

For the foregoing reasons, we conclude defective workmanship by an insured's subcontractor may constitute an occurrence under a modern standard-form CGL policy containing a subcontractor exception to the "your work" exclusion. We therefore conclude the court of appeals correctly determined the district court correctly interpreted the Arch policy.

## VII. Disposition.

Determining whether coverage exists under an insurance policy requires us to determine whether its terms are ambiguous in the context of the policy as a whole, including all relevant exceptions and exclusions. Accordingly, we conclude defective workmanship by an insured's subcontractor may constitute an occurrence under the terms of the Arch policy incorporated by reference into the NSC policy. We thus affirm the court of appeals decision affirming the district court rulings as to the meaning of the term "occurrence" for purposes of determining the scope

of coverage afforded by the Arch policy. The court of appeals decision shall stand as the final decision of this court with respect to all other issues raised on appeal. Therefore, we affirm in part and reverse in part the district court judgment and remand the case to the district court with instructions to enter a supplemental judgment specifying the statutory rate at which prejudgment interest accrued consistent with the decision of the court of appeals.

**DECISION OF THE COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH INSTRUCTIONS.**

All justices concur except Waterman, J., Cady, C.J., and Mansfield, J., who dissent.

**WATERMAN**, **Justice (dissenting).**

I respectfully dissent. In my view, there was no liability coverage for the builder under the facts of this case because there was no accident as required under the terms of the insurance contract. National Surety Corporation, therefore, was entitled to a directed verdict on Westlake's coverage claims. Our precedent defines "accident"—as used in a commercial general liability (CGL) occurrence policy with the same "occurrence" definition—to mean "an undesigned, *sudden,* and unexpected event." *Pursell Constr., Inc. v. Hawkeye-Sec. Ins. Co.,* 596 N.W.2d 67, 70 (Iowa 1999) (emphasis added) (quoting *Cent. Bearings Co. v. Wolverine Ins. Co.,* 179 N.W.2d 443, 448 (Iowa 1970)). There is nothing sudden about the gradual infiltration of rainwater through leaky window frames over several seasons, which the United States Court of Appeals for the Eighth Circuit squarely held is not a covered occurrence in a recent case applying Iowa law to the same policy language. *Liberty Mut. Ins. Co. v. Pella Corp.,* 650 F.3d 1161, 1175–76 (8th Cir. 2011). The majority disregards that persuasive decision directly on point and instead relies on inapposite Iowa authority finding liability coverage for a landlord's negligent supervision of an employee who flashed tenants. *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.,* 642 N.W.2d 648, 651 (Iowa 2002). That makes no sense to me.

I would honor stare decisis and conclude that defective workmanship that allows rainwater to leak into a residence is not an accident and, therefore, is not a covered occurrence under the CGL policy. The policy defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." This is the same policy language that we

interpreted in *Pursell* and the Eighth Circuit applied in *Pella Corp.* The majority never identifies the "sudden unexpected event" that triggers liability coverage for the mold and water damage resulting from leaky, defective window frames. The majority in effect converts the liability insurance policy into a home warranty.

Both parties agreed that an accident required a sudden event. At oral argument, Westlake's counsel contended that rainfall or poor workmanship was the sudden event:

> CHIEF JUSTICE CADY: What is the sudden nature of the event? A. I think the sudden nature of the water leaks are that they happen primarily when a rain event occurs. A rain event doesn't happen all the time. It can be a sudden event from the perspective of a general contractor, and event causes damage. Setting that aside, I think the sudden event could also be subcontractor work being done defectively.

Counsel also argued the severe winter in 2003–2004, with hard frosts,[14] caused insured damage to the apartment buildings. A majority of courts in other jurisdictions hold poor-workmanship claims are not covered under CGL policies. *See Grp. Builders, Inc. v. Admiral Ins. Co.*, 231 P.3d 67, 73 (Haw. Ct. App. 2010) (surveying cases to conclude "[a] majority of . . . jurisdictions ha[ve] held that claims of poor workmanship, standing alone, are not occurrences that trigger coverage under CGL policies" (quoting *Gen. Sec. Indem. Co. of Ariz. v. Mountain States Mut. Cas. Co.*, 205 P.3d 529, 535 (Colo. App. 2009), *superseded by statute*, Colo. Rev. Stat. Ann. § 13–20–808(1)(b)(III) (effective May 21, 2010)). "In contrast, a minority of jurisdictions ha[ve] held that the damage resulting from faulty workmanship is an accident, and thus, a covered occurrence, so long as the insured did not intend the resulting damage." *Id.* (quoting

---

[14]Westlake cites no case holding frost damage to a building is a covered accident under a CGL policy.

*Gen. Sec. Indem. Co.*, 205 P.3d at 535)). The case directly on point applying Iowa law and the majority rule—*Pella Corp.*—holds there is no CGL coverage for water damage from leaky window frames. I would follow that authority.

My colleagues, without finding any ambiguity in the occurrence definition, rely heavily on the insurance industry's drafting history for that standard policy language. We should not go beyond the four corners of the insurance contract to interpret unambiguous policy language. Westlake makes no claim that its assignee relied on any industry understanding or drafting history when it purchased the insurance policies at issue. More likely, the premiums for the policy were priced based on risks under well-settled Iowa law holding poor workmanship is not covered. In *Iowa Comprehensive Petroleum Underground Storage Tank Fund Board v. Farmland Mutual Insurance Co.*, we concluded the drafting history of a CGL policy's pollution exclusion was irrelevant because the contract language was unambiguous. 568 N.W.2d 815, 819 (Iowa 1997) ("We reject the [insured's] argument that the court should have considered the industry 'understanding' in 1970 in interpreting the sudden and accidental language of the policies."). The majority ignores that case and the well-settled principle it applies.

The majority relies on language in an exception to exclusion "m" to change the scope of coverage under the occurrence definition:

> **m.** **Damage to Impaired Property or Property Not Physically Injured**
>
> . . . .
>
> This exclusion does not apply to the loss of use of other property arising out of *sudden and accidental*

physical injury to "your product" or "your work" after it has been put to its intended use.

(Emphasis added.) The majority erroneously concludes that the phrase "sudden and accidental" in exclusion "m" means the term "accident" in the occurrence definition does not mean a *sudden* unintended event. Westlake never made that argument, and no other court has reached the same conclusion. I would not make that leap. In *Iowa Comprehensive*, we interpreted the phrase "sudden and accidental" in a CGL policy's pollution exclusion to hold sudden had a temporal meaning ("abrupt") when paired with accidental. 568 N.W.2d at 818–19. Accordingly, that exclusion barred coverage for "pollution [that] occurred over a period of many years." *Id.* at 819. And we interpreted accidental in the same pairing to mean "unexpected and unintended." *Id.* at 818 (quoting *Weber v. IMT Ins. Co.*, 462 N.W.2d 283, 287 (Iowa 1990)). We did so to give each word in the pair a meaning that avoided rendering the other word redundant. *Id.* That is, if we had interpreted accidental to mean sudden, then the term "sudden" in that pairing would be surplusage. *Id.* at 818–19. The problem with the majority's analysis is that the occurrence definition uses the word "accident" alone, and as we held in *Pursell*, it means a sudden, unexpected event. *Pursell Constr.*, 596 N.W.2d at 70. There was nothing sudden about the damage from water leaks over the winter of 2003–2004 in this case. *See Iowa Comprehensive*, 568 N.W.2d at 819 (rejecting argument that each leakage of pollutants was a discrete, sudden event).

I acknowledge there is a split in authority on these coverage questions. Many courts cited by today's majority have held defective work by a subcontractor *can be* an occurrence. I agree that defective workmanship can lead to an occurrence covered under CGL policies *if*

*and when* there is a sudden and unexpected event resulting in damage to a third party, rather than to the poorly constructed building itself. If a defectively installed balcony collapses and injures a passerby who sues the builder, that strikes me as a covered occurrence under a liability policy. But a property owner who sues the builder to replace a sagging balcony before it collapses does not allege an occurrence covered under the builder's CGL policy.

What Westlake lacks is a sudden event causing damage to something other than the buildings. A subcontractor's faulty work that causes gradual water infiltration is not an accident or covered occurrence, and the CGL insurer is not required to pay for the resulting water damage requiring repairs to the building itself. As the Seventh Circuit aptly observed, if "insurance proceeds could be used for damages from defective workmanship, a contractor could be initially paid by the customer for its work and then by the insurance company to repair or replace the work." *Lagestee-Mulder, Inc. v. Consol. Ins. Co.*, 682 F.3d 1054, 1057 (7th Cir. 2012) (quoting *CMK Dev. Corp. v. W. Bend Mut. Ins. Co.*, 917 N.E.2d 1155, 1168 (Ill. App. Ct. 2009)). Accordingly, the better-reasoned opinions

> require that for an incident to constitute an "occurrence" or "accident" in the building construction context, "there must be damage to something other than the structure, *i.e.*, the building, in order for coverage to exist." "[T]he natural and ordinary consequences of defective workmanship . . . d[o] not constitute an occurrence.' "

*Cincinnati Ins. Co. v. Northridge Builders, Inc.*, No. 12 C 9102, 2015 WL 5720256, at *5 (N.D. Ill. Sept. 30, 2015) (quoting *Viking Constr. Mgmt., Inc. v. Liberty Mut. Ins. Co.*, 831 N.E.2d 1, 16 (Ill. App. Ct. 2005)). The damages awarded by the jury here were for the costs of repairing the apartment buildings, not other property.

I take issue with my colleagues' conclusion that most other courts would find CGL coverage on this record. Westlake seeks recovery of the costs to remedy poor workmanship. The following state supreme courts have held that the cost to repair defective construction is not covered under a CGL policy. *Owners Ins. Co. v. Jim Carr Homebuilder, LLC,* 157 So. 3d 148, 156 (Ala. 2014) (per curiam) ("In sum, the cost of repairing or replacing faulty workmanship is not the intended object of a CGL policy issued to a builder or contractor."); *Essex Ins. Co. v. Holder,* 261 S.W.3d 456, 460 (Ark. 2008) (per curiam) ("Faulty workmanship is not an accident; instead, it is a foreseeable occurrence, and performance bonds exist in the marketplace to insure the contractor against claims for the cost of repair or replacement of faulty work."), *superseded by statute*, Ark. Code Ann. § 29–79–155(a)(2) (West 2011); *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.,* 306 S.W.3d 69, 76 (Ky. 2010) (holding there was no occurrence because "[o]ne cannot logically say . . . that the allegedly substandard construction of the . . . home by the [contractor] was a fortuitous, truly accidental, event"); *Concord Gen. Mut. Ins. Co. v. Green & Co. Bldg. & Dev. Corp.,* 8 A.3d 24, 28 (N.H. 2010) (holding defective work in constructing a chimney that required replacement was not an occurrence under CGL policy); *Westfield Ins. Co. v. Custom Agri Sys., Inc.,* 979 N.E.2d 269, 273 (Ohio 2012) (holding defective work constructing grain bin was not an occurrence because faulty workmanship is not fortuitous); *Oak Crest Constr. Co. v. Austin Mut. Ins. Co.,* 998 P.2d 1254, 1257–58 (Or. 2000) (holding deficient performance of a construction contract cannot be an accident under a CGL policy); *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.,* 908 A.2d 888, 899 (Pa. 2006) (holding owner's claims against builder arising from faulty workmanship constructing industrial facility were not covered under

CGL policy "intended to insure against accidents"); *L-J, Inc. v. Bituminous Fire & Marine Ins. Co.*, 621 S.E.2d 33, 36 (S.C. 2005) ("[B]ecause faulty workmanship is not something that is typically caused by an accident or by exposure to the same general harmful conditions, we hold that the damage in this case did not constitute an occurrence."), *superseded by statute*, S.C. Code Ann. § 38–61–70(B)(2) (2011); *see also Transp. Ins. Co. v. AARK Constr. Grp., Ltd.*, 526 F. Supp. 2d 350, 356–57 (E.D.N.Y. 2007) (holding CGL insurer did not cover cost to repair parking garage or loss of use of the structure because "[t]o hold otherwise would convert [the CGL insurer] into a surety for [the builder's] performance"); *Gen. Sec. Indem. Co.*, 205 P.3d at 535 (discussing the competing approaches and adopting the majority approach that faulty construction is not an occurrence under a CGL policy); *Grp. Builders, Inc.*, 231 P.3d at 69, 73 (holding that mold damage to apartment building caused by defective construction was not an occurrence); *Prod. Sys., Inc. v. Amerisure Ins. Co.*, 605 S.E.2d 663, 666 (N.C. Ct. App. 2004) ("[D]amages based solely on shoddy workmanship . . . are not 'property damage' within the meaning of a standard form CGL policy." (quoting *Wm. C. Vick Constr. Co. v. Pa. Nat'l Mut. Cas. Ins. Co.*, 52 F. Supp. 2d 569, 583 (E.D.N.C. 1999))). I would keep our state in this majority.

In *Pursell*, we held that defective workmanship is not an occurrence under a CGL policy. 596 N.W.2d at 71. Pursell Construction, Inc. was hired to build the basements, footings, block works, sidewalks, and driveways for two houses in Council Bluffs. *Id.* at 68. The homes were built on a floodplain, and Pursell had violated a city ordinance that required the basement to be elevated above the floodplain. *Id.* As a result, the homeowner could not legally occupy, rent, or sell the houses. *Id.* The homeowner sued Pursell, alleging breach of contract

and negligence for failing to build the lowest floor at the required elevation. *Id.* Pursell brought a declaratory judgment action against its CGL insurer to determine coverage. *Id.* The district court held that there was an occurrence under the policy requiring the insurer to defend the owner's lawsuit against Pursell. *Id.*

We reversed and held that under the standard CGL policy, an occurrence requires an accident. *Id.* at 70. We defined the term "accident" in the CGL policy as

> an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force. . . . [G]iving to the word the meaning which a man of average understanding would, we think ["accident"] clearly implies a misfortune with concomitant damage to a victim, and not the negligence which eventually results in that misfortune.

*Id.* (quoting *Cent. Bearings Co.*, 179 N.W.2d at 448). We noted that the "majority of courts that have considered this issue have concluded that a CGL policy does not provide coverage for claims against an insured for the repair of defective workmanship that damaged only the resulting work product." *Id.* "In short, defective workmanship, standing alone, is not an occurrence under a CGL policy." *Id.* at 71. "If the [CGL] policy is construed as protecting a contractor against mere faulty or defective workmanship, the insurer becomes a guarantor of the insured's performance of the contract, and the policy takes on the attributes of a performance bond." *Id.* (quoting *U.S. Fid. & Guar. Corp. v. Advance Roofing & Supply Co.*, 788 P.2d 1227, 1233 (Ariz. Ct. App. 1989)); *see also Auto-Owners Ins. Co. v. Home Pride Cos.*, 684 N.W.2d 571, 577 (Neb. 2004) ("[T]he cost to repair and replace the damages caused by faulty workmanship is a business risk not covered under a CGL policy.").

The majority gives short shrift to stare decisis. Although the majority initially distinguishes *Pursell* by noting that the court "need not consider whether property damage arising due to the insured's own defective workmanship may constitute an occurrence," the majority goes on to state we "call[ed] into question" *Pursell* in *Shelly Funeral Home*, a case that never mentions *Pursell.* In *Shelly Funeral Home*, Ted Shelly, a manager for the insured funeral home, took advantage of having keys to gain access to rental units owned by his employer. 642 N.W.2d at 650. He "emotionally injured . . . elderly tenants by repeatedly exposing himself and subjecting them to displays of pornography" while working for Shelly Funeral Home. *Id.* The funeral home's liability insurer brought a declaratory judgment to determine coverage. *Id.* at 652. The insurer argued its policy did not cover damages intentionally inflicted by the employee. *Id.* at 653. We reframed the coverage question as to whether the policy covered claims alleging the employer's negligent supervision, noting "[t]he conduct ascribed to the actor—Shelly Funeral Home—is not intentional sexual misconduct but negligent supervision of its employee." *Id.* at 654. We held the liability policy covered claims alleging the employer's negligent supervision of its employee. *Id. Shelly Funeral Home* in no sense "call[ed] into question" *Pursell*; those cases adjudicated different issues.[15] A key difference is that in *Shelly Funeral Home*, we found the liability policy covered the injury claims asserted by third-party tenants. Here, and in *Pursell,* the damages sought were for

---

[15]Neither Westlake nor the amici ask us to overrule *Pursell* or argue *Shelly Funeral Home* implicitly or explicitly overruled *Pursell.* The parties' briefs in *Shelly Funeral Home* did not even cite *Pursell*, much less ask us to overrule it. Normally, we do not overrule our precedent sua sponte. Nor has the Iowa legislature overruled *Pursell.*

the costs to remedy the construction defects, not harm to a third party or other property.

Our court of appeals correctly considered *Pursell* good law in 2009, five years after we decided *Shelly Funeral Home*. *W.C. Stewart Constr., Inc. v. Cincinnati Ins. Co.*, No. 08–0824, 2009 WL 928871, at *2–4 (Iowa Ct. App. Apr. 8, 2009). In that case, a subcontractor sought indemnification for defective subgrading that caused a wall, built by a different subcontractor, to crack. *Id.* at *1. The court applied *Pursell* and concluded the policy did not cover the damage. *Id.* at *3–4.

The Eighth Circuit likewise considered *Pursell* good law in *Pella Corp.*, 650 F.3d at 1175. The plaintiff homeowners in the underlying lawsuits alleged Pella sold defective windows that allowed water to leak through the windows' aluminum cladding. *Id.* at 1164. The Eighth Circuit, relying on *Pursell*, held that

> the property damage—whether to the windows themselves or the structure of the building near the windows—was caused by a defect that Pella was alleged to have known about. Under Iowa law, such defective workmanship . . . cannot be considered an occurrence, i.e., "an undesigned, sudden, and unexpected event."

*Id.* at 1176 (quoting *Pursell*, 596 N.W.2d at 70). I reach the same conclusion here.

A different result is not warranted because the defective work here was performed by subcontractors rather than the insured general contractor responsible for their work. "Damage resulting from defective work performed by *subcontractors* is *also* not an 'accident' and thus not an 'occurrence' within the meaning of a general contractor's CGL policy . . . ." *Northridge Builders, Inc.*, 2015 WL 5720256, at *5. An occurrence is "dependent on the nature of the act, not on who performs it." *Hastings Mut. Ins. Co. v. Mosher, Dolan, Cataldo & Kelly, Inc.*, No. 265621, 2006

WL 1360404, at *3, 6 (Mich. Ct. App. May 18, 2006) (holding mold damage in the subfloor material and joists above the basement ceiling caused by defective construction was not an occurrence); *see also Oak Crest Constr. Co.*, 998 P.2d at 1257–58 (holding subcontractor's "deficient" painting work was not an accident and, therefore, not an occurrence under the CGL policy); *Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706, 715–16 (Pa. Super. Ct. 2007) (holding subcontractor's faulty construction was not an occurrence under a CGL policy with a subcontractor exception to a "your work" exclusion).

The majority improperly relies on the exceptions to the "your work" exclusion to create coverage. We recently held that exceptions to exclusions cannot be used to broaden the grant of coverage in the insuring clause (occurrence definition). *Amish Connection, Inc. v. State Farm Fire & Cas. Co.*, 861 N.W.2d 230, 239–40 (Iowa 2015) ("In simplistic terms, the process is such: if the insuring clause does not extend coverage, one need look no further. If coverage exists, exclusions must then be considered." (quoting *Hartford Cas. Ins. Co. v. Evansville Vanderburgh, Pub. Library*, 860 N.E.2d 636, 646 (Ind. Ct. App. 2007))). "[A]n exception to an exclusion does not create coverage or provide an additional basis for coverage but, rather, 'merely preserves coverage already granted in the insuring provision.'" *Stoneridge Dev.*, 888 N.E.2d at 656 (citation omitted) (quoting *W. Cas. & Sur. Co. v. Brochu*, 475 N.E.2d 872, 878 (Ill. 1985)); *see also Aquatectonics, Inc. v. Hartford Cas. Ins. Co.*, No. 10-CV-2935 (DRH) (ARL), 2012 WL 1020313, at *7 (E.D.N.Y. Mar. 16, 2012) (holding a subcontractor exception to a "your work" exclusion did not broaden definition of an "occurrence" under the policy); *Millers Capital Ins. Co.*, 941 A.2d at 715–16 (declining to find exception in "your work" exclusion with a subcontractor exception broadened

insurance coverage).    There is no coverage without a sudden event, regardless of whether the defective work was performed by a subcontractor instead of the insured general contractor.

Some courts cited by the majority hold faulty construction can be an occurrence under a CGL policy based on a judicial definition of accident that omits the word sudden.  For example, in *Cherrington v. Erie Insurance Property & Casualty Co.,* the West Virginia Supreme Court began its analysis of whether faulty construction can be an occurrence as we did in *Pursell*—by defining accident.  745 S.E.2d 508, 520 (W. Va. 2013).  But it defined accident as "not deliberate, intentional, expected, desired, or foreseen" by the insured.  *Id.* (quoting *Columbia Cas. Co. v. Westfield Ins. Co.,* 617 S.E.2d 797, 801 (W. Va. 2005)).   The court concluded that under this definition of accident, faulty construction must be an occurrence because "[t]o find otherwise would suggest that [the contractor] deliberately sabotaged the very same construction project it worked so diligently to obtain."  *Id.*   Such cases are readily distinguishable from *Pursell* in which we defined accident to include the temporal requirement that it be sudden.   That requirement does not encompass Westlake's claim for gradual damage from water infiltration over a period of months.

The majority cites several state supreme court decisions without mentioning the dissents in those cases.  Chief Justice Shepard, in his dissenting opinion in *Sheehan Construction Co. v. Continental Casualty Co.,* noted CGL policies "are neither designed nor priced as coverage for whatever demands the insured may face in the nature of ordinary consumer claims about breach of warranty."  935 N.E.2d 160, 172 (Ind. 2010) (Shepard, C.J., dissenting).  He questioned whether there "exist[s] in the marketplace an insurance product that 'covers me when I don't do

a very good job.'" *Id.* Another dissenting justice emphasized the distinction between an uncovered repair to the building itself and a covered accident when defective construction results in harm to another. *Id.* at 172–73 (Sullivan, J., dissenting). Chief Justice Vande Walle, dissenting in *K & L Homes, Inc. v. American Family Mutual Insurance Co.*, agreed with the Indiana dissent and disagreed with overruling South Dakota precedent holding "property damage caused by faulty workmanship is a covered occurrence [only] to the extent it causes damage to property other than the work product." 829 N.W.2d 724, 743 (S.D. 2013) (Vande Walle, C.J., dissenting). Again, Westlake was awarded damages for repairs to the building itself. I fall on the side of the numerous courts holding those costs are not covered under this CGL policy.

In *Motorists Mutual Insurance Co.*, the contractor built a home "so poorly . . . that it was beyond repair and needed to be razed" within five years of its completion. 306 S.W.3d at 71. The Kentucky Supreme Court held that defective workmanship, standing alone, is not an occurrence under a CGL policy. *Id.* at 73. The court defined an accident in the insurance law context as "something that does not result from a plan, design, or . . . intent on the part of the insured." *Id.* at 76 (quoting *Stone v. Ky. Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 812 (Ky. Ct. App. 2000)). "[F]ocusing solely upon whether [the contractor] intended to build a faulty house is insufficient. Rather, a court must also focus upon whether the building of the . . . house was a ' "chance event" beyond the control of the insured . . . .'" *Id.* (quoting 16 Eric Mill Holmes, *Holmes' Appleman on Insurance* 2d § 116.1B, at 6 (2000)). Because the contractor had control over the construction of the home, whether

directly or through its subcontractors, there was no accident or covered occurrence. *Id.*

The Third Circuit reached the same conclusion in *Specialty Surfaces International, Inc. v. Continental Casualty Co.,* 609 F.3d 223, 238–39 (3d Cir. 2010). In *Specialty Services,* a general contractor installed a turf football field for a school. *Id.* at 227. Within a year of its completion, the field "began to exhibit defects in materials and workmanship" caused by a defectively constructed water drainage system. *Id.* at 228. The insured general contractor argued the liability insurer owed a duty to defend because the subgrade, which was the cause of the drainage problems, was installed by a subcontractor. *Id.* at 238. The Third Circuit applied Pennsylvania law and rejected the contractor's coverage claims. *Id.* The Third Circuit held that "[f]aulty workmanship, even when cast as a negligence claim, does not constitute such an [occurrence]; nor do natural and foreseeable events like rainfall." *Id.* at 231. These cases are persuasive and consistent with *Pursell.* I would follow those decisions.

For these reasons, I respectfully dissent.

Cady, C.J., and Mansfield, J., join this dissent.